T.C. Memo. 2016-212

UNITED STATES TAX COURT

CARI BARNES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28925-11.                        Filed November 22, 2016.

Cari Barnes, for herself.

<u>Lewis A. Booth II</u> and <u>Paul C. Feinberg</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The respondent (referred to here as the "IRS") issued
a notice of deficiency to the petitioner, Cari V. Barnes, for the 2008 and 2009 tax
years.  In this notice, the IRS determined income-tax deficiencies of $23,032 and

**[\*2]** $31,763 for 2008 and 2009, respectively, and accuracy-related penalties under section 6662(a) of $4,606.40 and $6,352.60 for 2008 and 2009, respectively.[1]

Barnes timely filed a petition under section 6213(a) for a redetermination of the deficiencies and the penalties. We have jurisdiction under section 6214(a).

The issues in the case have been narrowed by the parties through a stipulation of settled issues (and also partly through the stipulation of facts). We resolve the remaining issues as follows:

(1)    Barnes has unreported income of $25,754.71 for 2008 and $25,901.96 for 2009.

(2)    Barnes is not entitled to a business-expense deduction for Barnes & Barnes Financial Services for 2008 or 2009 in excess of the amount conceded by the IRS ($15,937 for 2008 and $17,984 for 2009).

(3)    Barnes is not entitled to a charitable-contribution deduction for 2008 or 2009 in excess of the amount allowed by the IRS in the notice of deficiency ($12,576 for 2008 and $16,381 for 2009).

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded to the nearest dollar.

**[*3]** (4)     Barnes is not entitled to a rental-property-expense deduction (that is,

deductions for the expenses of owning rental property) for 2008 or 2009,

except that Barnes is entitled to a $932.49 deduction for real-property taxes

for 2009.

(5)     Barnes is liable for section-6662(a) accuracy-related penalties for 2008 and

2009.

FINDINGS OF FACT

Some facts have been stipulated, and they are so found.

1.     <u>Background</u>

During 2008 and 2009, Barnes resided at 10515 Bushy Creek, Houston,

Texas.[2]

Barnes has bachelor's degrees in computer science, computer information

systems, and theology. She has a master's degree in management. She has been

an accountant since at least 1994 and has prepared income-tax returns for

individuals since at least 2004.

During 2008 and 2009, Barnes worked as an accountant for Robert Half, a

staffing and temporary-work agency.

---

[2]Barnes resided in Texas when she filed her petition. Therefore, an appeal of our decision in this case would go to the U.S. Court of Appeals for the Fifth Circuit unless the parties designate another circuit. <u>See</u> sec. 7482(b)(1) and (2).

[*4]   During 2008 and 2009, Barnes also ran a tax-return-preparation business called Barnes & Barnes Financial Services.  Barnes attached Schedules C, "Profit or Loss From Business", to her 2008 and 2009 tax returns to report the income and expenses of this business, a sole proprietorship.  She prepared approximately 100 income-tax returns annually as part of this business.  She leased an office for this business at 2626 South Loop West, Suite 655, Houston, Texas.  When handling the work of this business, she usually used this office.

During 2008 and 2009, Barnes also ran a business that performed financial-consulting work for churches.  Barnes attached a second Schedule C to each of her 2008 and 2009 tax returns to report the income and expenses of this business, a business that, like her tax-return-preparation business, was a sole proprietorship.  Barnes did financial-consulting work for Williams Temple Church of God (referred to here as "the church" or "Williams Temple Church").  In 2009, Barnes received at least $10,000 from the church for this financial-consulting work.  She reported $10,000 on the second Schedule C attached to her 2009 tax return.

During 2008 and 2009, Barnes also volunteered for Williams Temple Church as the church's "Special Events Coordinator".  In this volunteer role she ordered food for events hosted at the church, reserved party space, and purchased supplies.  The church did not have a reimbursement policy, written or otherwise,

[*5] regarding the types of expenses incurred by church volunteers that the church would reimburse. Barnes had the authority to approve reimbursements from the church. For a number of reimbursement requests submitted to the church, Barnes made the request and also approved it.

In August 2008, Barnes went on a trip to Africa during which she visited Dar es Salaam, Tanzania, and Nairobi, Kenya. Barnes visited schools and orphanages on the trip. Barnes also went on safaris during the trip. The trip was organized and sponsored by Williams Temple Church. Barnes paid $5,112 to Genesis Travel, a travel agency, for the trip. In exchange for the $5,112, Barnes received airplane tickets, meals, and lodging.

During 2008 and 2009, Barnes owned a 50% interest in real property at 2115 North Durham Drive, Houston, Texas (referred to here as the "Durham Drive property"). Barnes inherited her 50% interest in the Durham Drive property from her father, Titus Barnes, following his death in 2001. Barnes's sister, Cassandra Mallett, inherited the other 50% interest in the Durham Drive property from Titus Barnes. Titus Barnes's will gave Barnes an option to buy her sister's interest in the Durham Drive property for $16,000. Barnes did not buy her sister's interest in the Durham Drive property until 2013, when she bought it from her sister for only $3,000 (rather than the $16,000 provided for in the option).

**[*6]**   Barnes rented the Durham Drive property to her cousin, Timothy Dixon, during 2008 and 2009, for $200 per month.  The record does not show, nor does Barnes take the position, that she shared the rent she received with her sister, with whom she co-owned the house.  At $200 per month, Barnes was supposed to receive rent of $2,400 per year.  Dixon missed several of the $200 rent payments.  As Barnes reported on her 2008 and 2009 tax returns, she received from Dixon total rent of only $800 in 2008 and $1,000 in 2009.  Barnes did not begin eviction proceedings against Dixon despite his missing several rent payments.

Barnes received various payments from her father's estate during 2008 and 2009 that were unrelated to the Durham Drive property.  These payments are discussed in greater detail infra part 1.a.

Barnes maintained the following ten bank accounts during the 2008 and 2009 tax years:

- Bank of America checking account ending in 8675

- Bank of America checking account ending in 9517

- Bank of America checking account ending in 4470

- Bank of America IRA ending in 5771

- Bank of America checking account ending in 6621

- Bank of America savings account ending in 2071

**[*7]**   •      Bank of America savings account ending in 5962

•      Bank of America savings account ending in 2422

•      Wells Fargo checking account ending in 3054

•      Wells Fargo savings account ending in 3183

Barnes made numerous deposits into a number of her bank accounts throughout 2008 and 2009.

2.      Barnes's tax returns

a.      2008

Barnes filed a Form 1040, "U.S. Individual Income Tax Return", for the 2008 tax year. She reported two exemptions, wages of $64,242, interest income of zero, dividend income of zero, a business loss of $4,014, a net rental-property loss of $9,474, itemized deductions of $27,769, and taxable income of $15,985.

Barnes attached a Schedule A, "Itemized Deductions", to her 2008 tax return. She reported, among other things, real-estate taxes of $2,557 and total charitable contributions of $16,727. The Schedule A did not report the amount of any individual charitable contribution or the names of the donee organizations.

On the Schedule C for Barnes & Barnes Financial Services for 2008, Barnes reported gross receipts of $18,237, total expenses of $17,120, and net business income of $1,117.

**[*8]** On the Schedule C for her financial-consulting work with churches for 2008, Barnes reported gross receipts of $3,520, total expenses of $8,651, and a net business loss of $5,131.

As mentioned above, Barnes reported a net business loss of $4,014 on her 2008 tax return. This was calculated as follows:

| Business | Business income/(loss) |
|---|---|
| Barnes & Barnes Financial Services | $1,117 |
| Financial-consulting work with churches | (5,131) |
| Net business income/(loss) | (4,014) |

Barnes attached to her 2008 tax return a Schedule E, "Supplemental Income and Loss", to report the income and expenses for the Durham Drive property under the heading of "Residential Rental Property". On this Schedule E, Barnes reported rent received of $800, expenses of $10,274, and a net rental-property loss of $9,474 from the Durham Drive property for 2008.

b. 2009

Barnes filed a Form 1040 for the 2009 tax year. She reported two exemptions, wages of $64,016, interest income of $108, dividend income of zero, a business loss of $1,771, a net rental-property loss of $9,151, itemized deductions of $26,252, and taxable income of $19,650.

**[*9]** Barnes attached a Schedule A to her 2009 tax return. She reported, among other things, real-estate taxes of $2,505 and total charitable contributions of $17,766. The Schedule A did not report the amount of any individual charitable contribution or the names of the donee organizations.

On the Schedule C for Barnes & Barnes Financial Services for 2009, Barnes reported gross receipts of $20,773, total expenses of $21,974, and a net business loss of $1,201.

On the Schedule C for her financial-consulting work with churches for 2009, Barnes reported gross receipts of $10,000, total expenses of $10,570, and a net business loss of $570.

As mentioned above, Barnes reported a net business loss of $1,771 on her 2009 tax return. This was calculated as follows:

| Business | Business income/(loss) |
| --- | --- |
| Barnes & Barnes Financial Services | ($1,201) |
| Financial-consulting work with churches | (570) |
| Net business income/(loss) | (1,771) |

Barnes attached to her 2009 tax return a Schedule E to report the income and expenses for the Durham Drive property under the heading of "Residential Rental Property". On this Schedule E, Barnes reported rents received of $1,000,

**[*10]** expenses of $10,151 (including $1,094 in property taxes), and a net rental-property loss of $9,151 from the Durham Drive property for 2009.

3.      Reconstruction of Barnes's income; notice of deficiency

In March 2011, the IRS reconstructed Barnes's income for the 2008 and 2009 tax years through a bank-deposits analysis for each year.  The IRS's bank-deposits analyses for 2008 and 2009 consisted of the following steps:

- •      The IRS totaled the deposits into Barnes's bank accounts.

- •      The IRS subtracted what it determined to be nontaxable deposits, such as transfers between accounts and such as deposits that it determined were traceable to nontaxable sources.

- •      The IRS subtracted the amounts of income that Barnes had reported on her tax returns (including wages, interest, gross receipts reported on the two Schedules C for each year, and rents reported on the Schedule E for each year).

**[*11]** •   The resulting amounts for each year were considered by the IRS to be Barnes's unreported income for each year. These amounts of unreported income thus determined were $30,543 and $53,785 for 2008 and 2009, respectively.[3]

On October 20, 2011, the IRS issued the notice of deficiency to Barnes for the 2008 and 2009 tax years determining income-tax deficiencies and accuracy-related penalties as noted supra. The notice of deficiency incorporated the IRS's determinations of Barnes's unreported income from the bank-deposits analyses explained supra.

The notice of deficiency allowed $1,883 of the $17,120 in business-expense deductions claimed by Barnes for Barnes & Barnes Financial Services on her 2008 tax return. In particular, it allowed:

-   zero of the $350 claimed for advertising,

---

[3]The notice of deficiency characterized the unreported income as unreported gross receipts for Barnes & Barnes Financial Services. Barnes does not contend that if she indeed has unreported income it should be attributed to her business of financial consulting for churches or her rental of the Durham Drive property rather than to Barnes & Barnes Financial Services. Therefore, although we consider the propriety of the IRS's determinations of unreported income in one respect (i.e., whether the income considered by the IRS to be unreported income was indeed income and unreported), we do not consider whether the unreported income is attributable to Barnes & Barnes Financial Services, as opposed to her business of financial consulting for churches or her rental of the Durham Drive property.

[*12] • zero of the $6,930 claimed for car and truck expenses,

• zero of the $242 claimed for depreciation,

• $1,651 of the $4,056 claimed for office rent,

• $232 of the $2,855 claimed for supplies,

• zero of the $100 claimed for taxes and licenses,

• zero of the $220 claimed for travel,

• zero of the $48 claimed for meal and entertainment expenses, and

• zero of the $2,319 claimed for other expenses.

The notice of deficiency allowed $7,116 of the $21,974 in business-expense deductions claimed by Barnes for Barnes & Barnes Financial Services on her 2009 tax return. In particular, it allowed:

• zero of the $500 claimed for advertising,

• zero of the $6,544 claimed for car and truck expenses,

• zero of the $300 claimed for contract labor,

• zero of the $1,090 claimed for depreciation,

• $283 of the $830 claimed for insurance,

• $300 for legal and professional services (rather than the $200 claimed),

• $3,740 of the $5,056 claimed for office rent,

[*13] • $672 of the $2,503 claimed for supplies,

• zero of the $100 claimed for taxes and licenses,

• zero of the $195 claimed for meal and entertainment expenses,

• $1,479 of the $1,523 claimed for utilities, and

• $642 of the $3,133 claimed for other expenses.

The notice of deficiency disallowed the full $8,651 of business-expense deductions Barnes claimed for her financial-consulting work with churches on her 2008 tax return.

The notice of deficiency disallowed the full $10,570 of business-expense deductions Barnes claimed for her financial-consulting work with churches on her 2009 tax return.

The notice of deficiency (1) disallowed all rental-property-expense deductions Barnes claimed ($10,274 for 2008, and $10,151 for 2009), and (2) recharacterized the amounts Barnes reported as rental income for both 2008 ($800) and 2009 ($1,000) as Barnes's "other income" instead of rental income.[4]

---

[4]The IRS's recharacterization of the rents from rental income to "other income" did not affect its calculation of the amount of the deficiency. Therefore we do not consider the propriety of this recharacterization.

**[*14]** The notice of deficiency allowed charitable-contribution deductions of $12,576 for 2008 (instead of the $16,727 Barnes claimed) and $16,381 for 2009 (instead of the $17,766 Barnes claimed).

The notice of deficiency determined that Barnes has unreported dividend income of $41 for 2008 and $38 for 2009.

After issuing of the notice of deficiency, the IRS made revisions to its bank-deposits analyses. The IRS's litigating position (i.e., the position the IRS presents to the Court in this case) regarding the amounts of Barnes's unreported income for 2008 and 2009 is based on these revised bank-deposits analyses. Exhibit 4-J in the trial record consists of copies of the IRS's original and revised bank-deposits analyses and summaries thereof for the 2008 tax year. Exhibit 5-J in the trial record includes copies of the IRS's original and revised bank-deposits analyses and summaries thereof for the 2009 tax year.

In its revised bank-deposits analysis for the 2008 tax year, the IRS determined that $1,693.79 of the $30,543 of bank deposits that it had treated as unreported income in the original bank-deposits analysis should be excluded from income. As a result, the IRS's revised bank-deposits analysis determined that Barnes's unreported income for 2008 was $28,849.21. As with the original bank-deposits analysis for 2008, the IRS computed this amount of unreported income by

[*15] subtracting various nontaxable items and already-reported items of income from the total amount of deposits into eight of Barnes's ten bank accounts in 2008.[5] The IRS computed the total deposits into Barnes's bank accounts in 2008 as follows:

---

[5]The two bank accounts which Barnes maintained during 2008 and 2009 that the IRS did not include in its reconstruction of Barnes's income were a Bank of America IRA ending in 5771 and a Bank of America savings account ending in 2071. The only deposits to these two bank accounts consisted of interest income. The total amount of such interest was $39.30 in 2008 and $95.63 in 2009. It appears that the IRS did not include the $39.30 of interest deposits in its $146,298.36 total of bank deposits for 2008 and that the IRS did not include the $95.63 of interest deposits in its $191,623.05 total of bank deposits for 2009. The IRS does not assert that there should be an increase in Barnes's income on account of these two bank accounts. We decline to consider whether these amounts were unreported income.

Barnes's bank-account statements reflected that she received and deposited dividends. No dividends were reported on her returns. To account for these unreported dividends, the notice of deficiency adjusted Barnes's income upward. The revised bank-deposits analysis also recognized that Barnes received the dividends, but the dividends were subtracted from the amounts of Barnes's unreported income determined under the revised bank-deposits analysis. The subtraction was appropriate, we believe, because the dividends were included in Barnes's income by the notice of deficiency separate and apart from the bank-deposits analysis. The parties have stipulated that Barnes earned the dividend income. This means they agree that the dividend adjustments in the notice of deficiency were correct. If the revised bank-deposits analysis had also included the dividends in Barnes's income, this would have resulted in double counting the dividends.

[*16]

| Bank account | Amount |
|---|---|
| Bank of America checking (4470) | $11,544.79 |
| Bank of America checking (6621) | 1,284.92 |
| Bank of America checking (8675) | 88,832.44 |
| Bank of America checking (9517) | 40,976.11 |
| Bank of America savings (2422) | 0.81 |
| Bank of America savings (5962) | 300.46 |
| Wells Fargo checking (3054) | 3,358.28 |
| Wells Fargo savings (3183) | 0.55 |
| Total | 146,298.36 |

In its revised bank-deposits analysis for the 2009 tax year, the IRS determined that $25,526.74 of the $53,785 of bank deposits it had treated as unreported income in the original bank-deposits analysis should be excluded from income. As a result, the IRS's revised bank-deposits analysis determined that Barnes's unreported income for 2009 was $28,258.26. As with the original bank-deposits analysis for 2009, the IRS computed this amount of unreported income by subtracting various nontaxable items and already-reported items of income from the total amount of deposits into eight of Barnes's ten bank accounts in 2009. The IRS computed the total deposits into Barnes's bank accounts in 2009 as follows:

[*17]

| Bank account | Amount |
|---|---|
| Bank of America checking (4470) | $28,750.91 |
| Bank of America checking (6621) | 2,145.00 |
| Bank of America checking (8675) | 111,169.88 |
| Bank of America checking (9517) | 42,582.50 |
| Bank of America savings (2422) | 0.21 |
| Bank of America savings (5962) | 275.17 |
| Wells Fargo checking (3054) | 6,484.08 |
| Wells Fargo savings (3183) | 215.30 |
| Total | 191,623.05 |

4.    Stipulations and concessions

Before trial the parties agreed to a stipulation of facts and a stipulation of settled issues. We adopt their stipulations.

As stated above, for 2008 Barnes deducted $8,651 of total expenses on her second Schedule C, which was the schedule she used for her financial-consulting work for churches. The deduction for these expenses was disallowed in the notice of deficiency. In the stipulation of settled issues, the parties stipulated that, "in settlement of the adjustments in the respondent's notice of deficiency", "[a]ll of Petitioner's [Barnes's] expenses related to her Schedule C-2 activity [financial-consulting work for churches] are classified as startup expenses in taxable year 2008." The IRS takes the position that this means that the expenses of Barnes's financial-consulting work for churches for 2008 are not immediately deductible

[*18] for the 2008 tax year but must be amortized by Barnes ratably over a period of 180 months.  See sec. 195; see also sec. 1.195-1, Income Tax Regs.  Barnes does not disagree.[6]

On her second Schedule C for 2009, Barnes reported income for this business of $10,000 and expenses of $10,570.  In the stipulation of settled issues, the parties stipulated that, "in settlement of the adjustments in the respondent's notice of deficiency", Barnes is allowed to deduct expenses to the extent of her income for this business.  It is undisputed that Barnes's income for this business for 2009 was $10,000.  Accordingly, the parties agreed that Barnes is allowed to claim total expenses of $10,000 for her financial-consulting work for churches for 2009.  Therefore, Barnes's net income/loss from her financial-consulting work for churches for 2009 is zero.

The stipulation of facts contains a table that is "a summary of the expenses claimed by petitioner and the amounts respondent alleges have been substantiated".  This table relates exclusively to the expenses that Barnes claimed as deductions for Barnes & Barnes Financial Services for 2008 and 2009.

---

[6]Neither party explained which month begins the 180-month period.

**[\*19]**

| Item | 2008 | 2009 |
|------|------|------|
| Advertising | $415 | $423 |
| Car and truck expenses | 3,465 | 3,277 |
| Contract labor | 0 | 300 |
| Depreciation | 0 | 904 |
| Insurance | 283 | 213 |
| Internet | 0 | 0 |
| Legal services | 0 | 300 |
| Meals & entertainment | 0 | 0 |
| Office rent | 4,050 | 4,079 |
| Office telephone | 1,619 | 0 |
| "Other expenses: Bank fees" | 344 | 259 |
| "Other expenses: Cellular phone" | 1,668 | 1,680 |
| "Other expenses: Donations" | 0 | 0 |
| "Other expenses: Postage" | 126 | 118 |
| "Other expenses: Professional development" | 475 | 710 |
| "Other expenses: Publications" | 0 | 0 |
| Supplies | 3,392 | 3,752 |
| Taxes and licenses | 100 | 100 |
| Travel | 0 | 0 |
| Utilities | 0 | 1,869 |
| Total | 15,937 | 17,984 |

After this table in the stipulation of facts is the following statement:

Petitioner [Barnes] is not in agreement with the amounts listed for Car & Truck Expenses, Insurance Expenses, Publications ["Other expenses: Publications"], and Internet Expenses for taxable years 2008 and 2009, the amount listed for Supplies expenses for taxable year 2009 and the amount listed for Office Telephone for taxable year 2009.

**[\*20]** Thus, this post-table statement expresses Barnes's disagreement with ten of the amounts listed in the table.

We now explain the significance of the amounts listed in the table. First, all the amounts listed (and which are greater than zero) are the amounts the IRS conceded to be deductible for the described categories and years. We conclude this is so because the stipulation of facts refers to the amounts in the table as "amounts respondent [the IRS] alleges have been substantiated." The stipulation by the IRS that it "alleges" that Barnes has "substantiated" the amount of a deduction is tantamount to a concession by the IRS that the amount is deductible.[7] Second, the amounts in the table are amounts that Barnes agrees are deductible for the described categories and years, with the exception of the ten amounts specified in the statement following the table. This statement, which expresses Barnes's lack of "agreement" with these ten amounts, implies that Barnes is in "agreement" with all the other amounts in the table.

To illustrate the effect of the post-table statement, it is helpful to reproduce the table in the stipulation of facts with each of the ten specified amounts in bold:

---

[7]The stipulation of facts uses the word "alleges" in an admittedly unusual sense. Normally when one says a party "alleges" a position, that means that the position would favor the alleging party if the position were adopted by a court.

[*21]

| Item | 2008 | 2009 |
|---|---|---|
| Advertising | $415 | $423 |
| Car and truck expenses | **3,465** | **3,277** |
| Contract labor | 0 | 300 |
| Depreciation | 0 | 904 |
| Insurance | **283** | **213** |
| Internet | **0** | **0** |
| Legal services | 0 | 300 |
| Meals & entertainment | 0 | 0 |
| Office rent | 4,050 | 4,079 |
| Office telephone | 1,619 | **0** |
| "Other expenses: Bank fees" | 344 | 259 |
| "Other expenses: Cellular phone" | 1,668 | 1,680 |
| "Other expenses: Donations" | 0 | 0 |
| "Other expenses: Postage" | 126 | 118 |
| "Other expenses: Professional development" | 475 | 710 |
| "Other expenses: Publications" | **0** | **0** |
| Supplies | 3,392 | **3,752** |
| Taxes and licenses | 100 | 100 |
| Travel | 0 | 0 |
| Utilities | 0 | 1,869 |
| Total | 15,937 | 17,984 |

To summarize, the amounts not in bold are amounts to which both Barnes and the IRS agreed, and the ten amounts in bold are the amounts that the IRS agreed Barnes is entitled to deduct and for which (as of the stipulation of facts) Barnes preserved the right to prove a higher amount.

**[\*22]** The stipulation of facts, executed by the parties at the beginning of trial, reflects the parties' positions at the beginning of trial. The parties' positions regarding unresolved items in the table are further established by the parties' statements at trial and the parties' statements in their post-trial briefs. We explain these statements and the effect of these statements below.

At trial, Barnes conceded on the record that she was not entitled to deduct office-telephone expenses for 2009. Accordingly, Barnes is not entitled to a deduction for office-telephone expenses for 2009.

During trial and in her post-trial briefs Barnes did not present any argument that she is entitled to deductions in excess of the amounts in the table for either insurance expenses or "Other expenses: Publications" for 2008 or 2009. Therefore, she has conceded that the amounts in the table for these categories for 2008 and 2009 are correct. See, e.g., Hedrick v. Commissioner, 63 T.C. 395, 396-397 (1974). Accordingly, Barnes is entitled to deductions of $283 for insurance expenses for 2008, $213 for insurance expenses for 2009, and zero for "Other expenses: Publications" for 2008 and 2009.

In her post-trial briefs, Barnes contends that she is entitled to deductions in excess of the amounts agreed to as deductible by both her and the IRS for cell-phone expenses and depreciation for 2008 and 2009. As explained supra, in the

[*23] stipulation of facts Barnes agreed with the IRS on the deductible amounts for both of these categories for 2008 and 2009. Barnes has not provided us with any reason to relieve her of this agreement. Under the circumstances we do not relieve Barnes of the agreement in question, and accordingly, we will not further address her claims raised in her post-trial briefs that she is entitled to deductions in excess of the amounts agreed to in the stipulation of facts as deductible by both Barnes and the IRS for cell-phone expenses or depreciation for 2008 or 2009. See Rule 91(e). Barnes is entitled to deductions of $1,668 for cell-phone expenses for 2008, $1,680 for cell-phone expenses for 2009, zero for depreciation for 2008, and $904 for depreciation for 2009.

To summarize, only the following business-expense deductions need to be resolved: car and truck expenses for 2008 and 2009, internet expenses for 2008 and 2009, and supplies expenses for 2009. The following two tables reflect for each respective tax year the (1) categories of unresolved business expenses that Barnes reported on her Schedule C for Barnes & Barnes Financial Services and (2) for each of these categories (a) the amounts Barnes claimed on the Schedule C, (b) the amounts allowed by the IRS in the notice of deficiency, (c) the amounts conceded by the IRS in the stipulation of facts, and (d) the amounts determined by the Court (determinations which are explained infra part 2).

[*24]

### 2008 Tax year

| Category | Amount per return | IRS position in notice of deficiency | IRS position reflected in stipulation of facts | Amount determined by the Court |
|---|---|---|---|---|
| Car and truck expenses | $6,930 | 0 | $3,465 | $3,465 |
| Internet | 0 | 0 | 0 | 0 |

### 2009 Tax year

| Category | Amount per return | IRS position in notice of deficiency | IRS position reflected in stipulation of facts | Amount determined by the Court |
|---|---|---|---|---|
| Car and truck expenses | $6,544 | 0 | $3,277 | $3,277 |
| Internet | 0 | 0 | 0 | 0 |
| Supplies | 2,503 | $672 | 3,752 | 3,752 |

## OPINION

1. <u>Barnes had unreported income of $25,754.71 for 2008 and $25,901.96 for 2009</u>.

The IRS reconstructed Barnes's income using the bank-deposits method for the 2008 and 2009 tax years. The IRS contends that Barnes failed to report income of $28,849.21 for 2008 and $28,258.26 for 2009. Barnes contends that all bank deposits that the IRS treated as unreported income were attributable to various nontaxable sources.

Section 6001 requires all taxpayers to maintain adequate books and records of taxable income. If a taxpayer fails to keep adequate records, then the IRS may

[*25] reconstruct the taxpayer's income by any reasonable method that clearly reflects income. See, e.g., sec. 446(b); Holland v. United States, 348 U.S. 121, 130-132 (1954). One acceptable method is the bank-deposits method. Clayton v. Commissioner, 102 T.C. 632, 645 (1994); DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). When using the bank-deposits method, the IRS assumes that if a taxpayer is engaged in an income-producing activity and makes deposits to bank accounts, then those deposits, less amounts identified as nonincome items and deductions, constitute taxable income. See Clayton v. Commissioner, 102 T.C. at 645-646.

Barnes was engaged in three income-producing activities during the years at issue (setting aside her work as an employee of Robert Half): (1) her tax-return-preparation business (Barnes & Barnes Financial Services), (2) her financial-consulting work for churches, and (3) her collection of rent for the Durham Drive property. With respect to her tax-return-preparation business, which appears to be the most financially significant of the three activities, Barnes did not keep any informal or formal books of account to record her income and expenses. Nor did she retain a bookkeeper or accountant. She also kept inadequate records for the expenses of the Durham Drive property. Barnes made numerous deposits into multiple bank accounts that were not attributable to her work as an employee of

[*26] Robert Half.  Under these circumstances, we conclude that it was reasonable for the IRS to use the bank-deposits method to reconstruct Barnes's income for 2008 and 2009.  See, e.g., sec. 446(b); Holland, 348 U.S. at 130-132.

The notice of deficiency issued by the IRS to Barnes incorporated the IRS's determinations of unreported income made in the IRS's original bank-deposits analyses.  After issuing the notice of deficiency, the IRS revised its bank-deposits analyses for the 2008 and 2009 tax years.  The IRS's litigating position regarding Barnes's unreported income is based on the revised bank-deposits analyses.  The IRS's revised bank-deposits analysis for 2008 reduced the amount it determined to be Barnes's unreported income from $30,543 to $28,849.21.  The revised bank-deposits analysis for 2008 treated several deposits as nontaxable which had previously been treated as taxable in the original bank-deposits analysis for 2008.  The revised bank-deposits analysis for 2008 also treated four deposits (totaling $1,045.75) as taxable which had previously been treated as nontaxable in the original bank-deposits analysis for 2008.  The IRS's revised bank-deposits analysis for 2009 reduced the amount it determined as Barnes's unreported income from $53,785 to $28,258.26 by treating several deposits as nontaxable which had previously been treated as taxable in the original bank-deposits analysis for 2009.

[*27] Barnes argues that the deposits that the IRS determined to be unreported income were attributable to various nontaxable sources.[8] (Barnes does not contend that any of the bank deposits determined by the IRS to be unreported income were already reported by her as income.) In support of her argument, Barnes provided three types of evidence: (1) her own testimony, (2) copies of checks that she received, and (3) a spreadsheet she prepared and labeled "Sources of Non-Taxable Income & Checks". This spreadsheet was admitted pursuant to an agreement by the parties that the spreadsheet should be treated by the Court as if it were Barnes's testimony.[9] Accordingly, we treat the spreadsheet as Barnes's testimony. The spreadsheet lists alleged deposits that Barnes claimed originated from nontaxable sources, but that she claims the IRS included in her income. The spreadsheet has the following information:

---

[8]Barnes also argues that the IRS misapplied the bank-deposits method because, as she vaguely asserts, the IRS "did not conduct an analysis of the cancelled checks, currency expenditures and cash on hand". Barnes does not explain exactly what she means by this. Furthermore, she raised this argument in the last brief she filed, a brief for which the IRS did not have an opportunity to respond. We decline to consider Barnes's vague and untimely argument.

[9]During trial the attorney for the IRS said that "as long as there's no determination that Respondent [the IRS] agrees with her explanations * * * if you'd like to treat her explanations in this document as her direct testimony and you as a fact-finder make the ultimate determination as to credibility, then we are fine with that."

[*28] • The amount of the alleged deposit.

• The date of the alleged deposit.

• The name of the bank account (for most of the alleged deposits).

• The date on which Barnes alleged she originally received the money allegedly deposited.

• The alleged nontaxable source of the money.

The following table summarizes the spreadsheet:

[*29]

| Alleged source of unreported deposits | Amount in 2008 | Amount in 2009 |
|---|---|---|
| Funds from her father's estate | $30,539.13 | $12,152.80 |
| Reimbursements from Williams Temple Church | 3,098.39 | 10,384.42 |
| Reimbursements from insurance companies for property damage | 2,159.44 | 26,017.12 |
| Federal income-tax refunds | 10,032.71 | 15,401.76 |
| Store and merchant refunds | 1,415.53 | 387.51 |
| "Reimbursements from various sources" | 747.03 | 317.54 |
| Repayments of loan principal from clients, friends, and family | 8,023.00 | 2,945.00 |
| Redeposit of unused American Express Traveler's checks | 250.00 | -0- |
| Reimbursement of attorney's fees paid on behalf of father's estate | 375.00 | -0- |
| Reimbursement for court fees paid on behalf of client | -0- | 100.00 |
| Gift from cousin | 25.00 | -0- |
| Deposits "from personal funds or other loans not previously reported" | 8,509.00 | 5,705.00 |
| Total[1] | 65,174.23 | 73,411.15 |

[1]The total amounts for both years that Barnes claimed were treated as unreported income by the IRS ($65,174.23 and $73,411.15) are significantly greater than the amounts actually treated as unreported income by the IRS ($28,849.21 for 2008 and $28,258.26 for 2009). This is because (1) some of the amounts in the spreadsheet were not deposited in Barnes's bank accounts (and therefore did not show up in the IRS's revised bank-deposits analyses), (2) some of the amounts in the spreadsheet were deposited in Barnes's bank accounts but the IRS did not consider them to be income, and (3) some of the amounts in the spreadsheet were deposited in Barnes's bank accounts but the IRS determined they had already been reported by Barnes.

**[\*30]**  The IRS argues that Barnes failed to prove that any of the deposits into her bank accounts that the IRS determined to be unreported income are traceable to the nontaxable sources listed above.

Barnes's argument, as we explained, is that the IRS erroneously included in her income deposits that were not actually income.  For her argument to prevail, all four of the following conditions must be true:  (1) Barnes received an amount, (2) the amount was nontaxable, (3) she deposited the amount into her bank accounts, and (4) the IRS treated this deposit as income in its bank-deposits analyses.  See Clayton v. Commissioner, 102 T.C. at 645-646.  Barnes's argument requires the resolution of factual matters.  To resolve a factual matter in its favor, the party bearing the burden of proof must prove the fact by a preponderance of the evidence.  Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987).  We now consider which party bears the burden of proof regarding the facts underlying Barnes's challenge to the IRS's revised bank-deposits analyses.

The following general rules regarding who bears the burden of proof are pertinent:

- The taxpayer generally bears the burden of proving that the determinations in the notice of deficiency are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

- The IRS bears the burden of proof regarding any "new matter". Rule 142(a)(1). "[N]ew matter" includes a new theory that requires the presentation of different evidence. See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989).

- The IRS bears the burden of proof regarding an increased deficiency. Rule 142(a)(1).

- The IRS bears the burden of proof for issues for which the taxpayer shows that the requirements of section 7491(a)(1) and (2) are satisfied. Higbee v. Commissioner, 116 T.C. 438, 442 (2001); see Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

  ○ Section 7491(a)(1) requires the taxpayer to present credible evidence with respect to factual issues relevant to ascertaining the taxpayer's tax liability. Credible evidence is evidence that, after critical analysis, would constitute a sufficient basis for deciding the issue in favor of the taxpayer if no contrary evidence were submitted. Higbee v. Commissioner, 116 T.C. at 442.

[*32]     ○     Section 7491(a)(2) requires the taxpayer to comply with substantiation and record-keeping requirements and cooperate with the IRS's reasonable requests for witnesses, information, documents, meetings, and interviews.

In addition, the following principles apply when the notice of deficiency is based on the bank-deposits method of reconstructing income:

- The taxpayer generally bears the burden of proving that the reconstruction is in error and may do so, in whole or in part, by proving that a deposit is not taxable. See Clayton v. Commissioner, 102 T.C. at 645-646.

- The IRS is not required to show a likely source of income for each deposit. Id. (citing Estate of Mason v. Commissioner, 64 T.C. 651, 657 (1975), aff'd, 566 F.2d 2 (6th Cir. 1977)).[10]

In this case, four of the deposits that the IRS determined were taxable were determined to be taxable only after it issued the notice of deficiency. These four deposits (totaling $1,045.75) involve "new matter" because determining whether

_____

[10]The cases cited for these principles, Clayton v. Commissioner, 102 T.C. 632, 645-646 (1994), and Estate of Mason v. Commissioner, 64 T.C. 651, 657 (1975), aff'd 566 F.2d 2 (6th Cir. 1977), did not consider the effect of sec. 7491(a), which was added to the Internal Revenue Code in 1998.

**[\*33]** the four deposits were unreported income requires evidence different from the evidence related to the adjustments in the notice of deficiency. So the IRS has the burden of proof with respect to the four deposits. See Rule 142(a) (imposing burden of proof on IRS for "new matter"). We conclude infra part 1.e. that Barnes has shown by a preponderance of the evidence that all four of these deposits were attributable to nontaxable sources. Therefore, even if Barnes had the burden of proof, we would still conclude that these four deposits are not taxable. We hold that these four deposits in 2008 totaling $1,045.75 (each of which is described in greater detail infra part 1.e.ii.) are not taxable and the IRS's determination of Barnes's unreported income for 2008 should be reduced by $1,045.75.

For all the remaining deposits determined to be taxable by the IRS (i.e., the deposits determined to be taxable by the IRS other than the four deposits totaling $1,045.75), the IRS's determinations were made as part of the notice of deficiency. Therefore, Barnes should have the burden of proving that the remaining deposits are not taxable. See Clayton v. Commissioner, 102 T.C. at 645-646 (taxpayer has burden of proving that deposits are not taxable in challenging bank-deposits analysis underlying notice of deficiency). The only potential exception is section

**[\*34]** 7491(a).[11] If Barnes were to satisfy section 7491(a), including the requirement that she present credible evidence, then the burden of proof would shift to the IRS with respect to that factual issue.

To consider the effect of section 7491(a), we divide the remaining deposits into two groups according to the conclusions made later in our opinion. The first group of the remaining deposits consists of those deposits for which we conclude later in the opinion Barnes has proven by a preponderance of the evidence were attributable to nontaxable sources. (As we explain later, Barnes has proven by a preponderance of the evidence that deposits treated as income by the IRS totaling $2,048.75 in 2008 (described in specific detail infra parts 1.b.i. and 1.f.i.) and $2,356.30 in 2009 (described in specific detail infra parts 1.b.ii., 1.e.ii., and 1.g.) were attributable to nontaxable sources.) For these deposits, even if the burden of proof were placed on the IRS, we would still conclude that these deposits were not taxable. Therefore it is unnecessary for us to determine whether Barnes has satisfied section 7491(a) with respect to the factual issues relevant to these

---

[11]The IRS revised its bank-deposits analyses after the notice of deficiency, but the revision did not cause an increase in the deficiency. See Rule 142(a) (imposing burden of proof on IRS for increased deficiencies). Although the IRS conceded that some deposits determined to be income in the notice of deficiency are not income, Barnes still has the burden of proof regarding all other deposits determined to be income in the notice of deficiency. Gobins v. Commissioner, 18 T.C. 1159, 1168-1169 (1952), aff'd per curiam, 217 F.2d 952 (9th Cir. 1954).

[*35] deposits.  See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).  We hold that $2,048.75 of deposits determined by the IRS to be includible in income for 2008 are not includible in income and $2,356.30 of deposits determined by the IRS to be includible in income for 2009 are not includible in income.  We therefore hold that the IRS's determination of Barnes's unreported income for 2008 should be reduced by $2,048.75 (which excludes the $1,045.75 mentioned in the paragraph above) and that the IRS's determination of Barnes's unreported income for 2009 should be reduced by $2,356.30.

We conclude later in the opinion that Barnes has not proven by a preponderance of the evidence that the remaining deposits in the second group were attributable to nontaxable sources.  These conclusions are discussed infra part 1.a. through 1.l.  For each of these deposits we hereby find (although we do not make a detailed explanation for this finding) that Barnes failed to present credible evidence that the deposits are nontaxable.  Thus, section 7491(a) has not been satisfied with respect to these remaining deposits, and Barnes bears the burden of proof with respect to them.

Our conclusions about the burden of proof regarding the bank-deposits method are summarized in the chart below.  This chart covers all deposits

[*36] determined by the IRS to be unreported income in its revised bank-deposits analyses.

| | Deposits that Barnes proved by a preponderance of the evidence are nontaxable | Deposits that Barnes failed to prove by a preponderance of the evidence are nontaxable |
|---|---|---|
| Deposits determined to be taxable by the IRS after the notice of deficiency | These are four deposits in 2008 totaling $1,045.75. For these deposits, the IRS has the burden of proof. | No such deposits |
| Deposits determined to be taxable by the IRS in the notice of deficiency | This is the "first group" of deposits mentioned in the text. For these deposits, there is no need to determine who has the burden of proof given our finding that Barnes has proven by a preponderance of the evidence that these deposits are nontaxable. | This is the "second group" of deposits mentioned in the text. We find that Barnes did not produce credible evidence that these deposits are nontaxable. Therefore, Barnes has the burden of proof regarding these deposits. |

a.      Funds from her father's estate

Barnes received the following five checks from the estate of her father,

Titus Barnes:

- a check for $8,000 received in 2008,

- a check for $22,359.13 received in 2008,

[*37] •        a check for $1,406.15 received in 2009,

•        a check for $6,318.49 received in 2009, and

•        a check for $4,427.16 received in 2009.

Barnes claims that the five checks she received from her father's estate were either (1) inheritance or (2) reimbursement for various expenses that Barnes personally incurred on behalf of her father's estate before his will was probated. Gross income does not include the value of property acquired by inheritance. Sec. 102(a). Nor does gross income include amounts received as reimbursement or loan repayment. See, e.g., Commissioner v. Tufts, 461 U.S. 300, 307 (1983).

Barnes did not directly deposit the five checks she received from her father's estate into her bank accounts. Instead, she testified that she cashed them, kept the cash at home, and later deposited the cash into her bank accounts in amounts that did not correspond to the amounts of the checks. However, Barnes did not prove that she kept track of the cash from the five checks or that she segregated this cash from her other cash. In our view, it is as likely that she spent the cash from the five checks as that she deposited this cash into her bank accounts. Accordingly, we cannot determine that any amounts that Barnes received from her father's estate were actually deposited into her bank accounts.

**[\*38]** Barnes failed to prove by a preponderance of the evidence that any deposits into the bank accounts used by the IRS in its revised bank-deposits analyses were attributable to nontaxable amounts that she received from her father's estate. Accordingly, we hold that no adjustments to the IRS's determinations of Barnes's unreported income for 2008 or 2009 for these amounts are warranted.

      b.      Reimbursements from Williams Temple Church

            i.      2008

For 2008, Barnes claims that she had deposits into her bank accounts totaling $3,098.39 that were attributable to reimbursements received from Williams Temple Church but were treated as income by the IRS. She identifies these deposits as follows:

| Amount | Bank account | Date deposited |
|--------|--------------|----------------|
| $699.99 | 8675 | Feb. 12, 2008 |
| 248.05 | 9517 | Mar. 3, 2008 |
| 421.64 | 9517 | Mar. 14, 2008 |
| 508.00 | 3054 | May 16, 2008 |
| 150.00 | 3054 | July 25, 2008 |
| 100.00 | 8675 | Nov. 3, 2008 |
| 870.71 | 8675 | Dec. 8, 2008 |
| 100.00 | 8675 | Dec. 18, 2008 |

As an initial matter, we conclude that the amounts identified in the table above of $421.64, $508, $150, and $100 (the $100 identified in the spreadsheet as

**[*39]** a November 3, 2008 deposit) were deposited into Barnes's bank accounts, and were already treated as nontaxable deposits by the IRS in its revised bank-deposits analysis for 2008. Therefore, no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted for these amounts.

The remaining amounts identified in the table above are $699.99, $248.05, $870.71, and $100 (the $100 identified in the spreadsheet as a December 18, 2008 deposit). We address these four amounts below.

The trial record contains a check written to Barnes from Williams Temple Church for $699.99 that Barnes deposited into her bank account ending in 8675 on February 2, 2008. The notation on the memo line of this check reads "Reimb./Printer for Pastor's office". The trial record also contains a "Check Request Form" (a form apparently used by Williams Temple Church to record requests that the church make a payment, the name of the person requesting the payment, the name of the person approving the payment, the requested amount of the payment, the requested payee, and the purpose of the payment) that corresponds to this $699.99 check. The form indicates that this $699.99 check was to be paid to Barnes and was for a "Printer". Meredith Jenkins signed this form as the "Requester" and Barnes signed this form as the "Approver". The IRS treated this $699.99 deposit as income in its revised bank-deposits analysis for

[*40] 2008. We conclude that this $699.99 deposit was attributable to a nontaxable reimbursement from the church and must be excluded from Barnes's income for the 2008 tax year.

The trial record contains a check written to Barnes from Williams Temple Church for $248.05 that Barnes deposited into her bank account ending in 9517 on March 3, 2008. The notation on the memo line of this check reads "Food for Superbowl Outreach". The trial record also contains a "Check Request Form" indicating that this $248.05 check was to be paid to Barnes and was for "Food-- Super Bowl". Jenkins signed this form as the "Requester" and Barnes signed this form as the "Approver". The IRS treated this $248.05 deposit as income in its revised bank-deposits analysis for 2008. We conclude that this $248.05 deposit was attributable to a nontaxable reimbursement from the church and must be excluded from Barnes's income for the 2008 tax year.

The trial record contains a check written to Barnes from Williams Temple Church for $870.71 that Barnes deposited into her bank account ending in 8675 on December 8, 2008. The notation on the memo line of this check reads "Reimb./Funds spent for Leadership Conference". The trial record also contains a "Check Request Form" indicating that this $870.71 check was to be paid to Barnes and was for a "Leadership Conference". This form was signed by Barnes as both

**[\*41]** the "Requester" and "Approver". The IRS treated this $870.71 deposit as income in its revised bank-deposits analysis for 2008. We conclude that this $870.71 deposit was attributable to a nontaxable reimbursement from the church and must be excluded from Barnes's income for the 2008 tax year.

The trial record contains a check written to Barnes from Williams Temple Church for $100 that she claims was deposited into her bank account ending in 8675 on December 18, 2008, which is also the date of the check. There is no $100 deposit into this bank account, or any of her bank accounts, on or around this date. We conclude that Barnes failed to prove by a preponderance of the evidence that she deposited this $100 check into any of her bank accounts. Accordingly, no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted for this $100 check.

In sum, we hold that the IRS's determination of Barnes's unreported income for 2008 must be adjusted to exclude nontaxable deposits totaling $1,818.75.

   ii. <u>2009</u>

For 2009, Barnes claims that she made deposits into her bank accounts totaling $10,384.42 that were attributable to reimbursements received from Williams Temple Church but were treated as income by the IRS. She identifies these deposits as follows:

[*42]

| Amount | Bank account | Date deposited |
|---|---|---|
| $1,004.65 | 8675 | Jan. 12, 2009 |
| 350.00 | 6621 | Jan. 12, 2009 |
| 1,513.20 | 8675 | Apr. 1, 2009 |
| 864.20 | 8675 | May 5, 2009 |
| 301.66 | 8675 | May 26, 2009 |
| 1,316.16 | 8675 | June 9, 2009 |
| 627.70 | 8675 | July 28, 2009 |
| 472.40 | 8675 | Aug. 19, 2009 |
| 293.87 | 8675 | Sept. 15, 2009 |
| 527.70 | 8675 | Oct. 21, 2009 |
| 890.75 | 8675 | Oct. 26, 2009 |
| 890.75 | 8675 | Oct. 26, 2009 |
| 665.69 | 8675 | Dec. 14, 2009 |
| 665.69 | 8675 | Dec. 14, 2009 |

As an initial matter, we conclude that the $301.66 identified in the table above was deposited into one of Barnes's bank accounts and was already treated as a nontaxable deposit by the IRS in its revised bank-deposits analysis for 2009. Therefore, no adjustment to the IRS's determination of Barnes's unreported income for 2009 is warranted for this amount.

The remaining amounts identified in the table above are $1,004.65, $350, $1,513.20, $864.20, $1,316.16, $627.70, $472.40, $293.87, $527.70, $890.75, $890.75, $665.69, and $665.69. We address these 13 amounts below.

[*43] The trial record contains a check written to Barnes from Williams Temple Church for $1,354.65 that Barnes claims was deposited into two of her bank accounts on January 12, 2009, through two separate deposits. Barnes claims that $1,004.65 of this $1,354.65 was deposited into her bank account ending in 8675 on January 12, 2009, and the remaining $350 was deposited into her bank account ending in 6621, also on January 12, 2009. Her bank statements show two such deposits on January 12, 2009. The notation on the memo line of the $1,354.65 check reads "Reimb./Christmas Gala & Law Enforcement Events". The trial record also contains a "Check Request Form" indicating that this check was to be paid to Barnes and was for a "Christmas Gala Event" and a "Law Enforcement Event". This form was signed by Barnes alone. The IRS treated these two deposits as income in its revised bank-deposits analysis for 2009. We conclude that these two deposits into Barnes's bank accounts totaling $1,354.65 were attributable to nontaxable reimbursements from the church and must be excluded from Barnes's income for the 2009 tax year.

Barnes failed to provide checks or check request forms for any of the other amounts which she claims (1) were nontaxable reimbursements she received from the church (2) were deposited into her bank accounts but (3) were treated as income by the IRS for 2009. There are deposits into her bank accounts on the

[*44] dates identified by Barnes that correspond to a few of these other amounts: $864.20, $627.70, $472.40, $293.87, $527.70, $890.75, and $665.69. However, the deposit entries on her bank statements do not indicate the payor (i.e., the person who wrote the checks that Barnes deposited), and therefore we cannot rely on the deposit entries to determine the origin of any of these deposits. There are no deposits into Barnes's bank accounts matching any of the other amounts listed in the table above. We conclude that Barnes failed to prove by a preponderance of the evidence that she received and subsequently deposited into her bank accounts any nontaxable reimbursements from Williams Temple Church in 2009 other than the $1,354.65 and $301.66 amounts described above.

In sum, we hold that the IRS's determination of Barnes's unreported income for 2009 must be adjusted to exclude $1,354.65.

c.      Reimbursements from insurance companies for property damage

i.      2008

For 2008, Barnes claims that she received, cashed, and subsequently deposited a $2,159.44 insurance reimbursement check from State Farm but the deposit was treated as income by the IRS. The trial record contains a copy of a check for $2,159.44 that Barnes received from State Farm on November 22, 2008, confirming that Barnes received this amount. Barnes testified that she cashed the

**[*45]** $2,159.44 check and deposited the cash into her bank accounts only "a little at a time as needed to make repairs." However, Barnes did not prove that she kept track of the cash from the $2,159.44 check or that she segregated this cash from her other cash. In our view, it is as likely that she spent the cash from this check as that she deposited this cash into her bank accounts. Barnes failed to prove by a preponderance of the evidence that she deposited into her bank accounts any amount of the $2,159.44 check that she received from State Farm in 2008. Accordingly, we hold that no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted.

        ii.    <u>2009</u>

For 2009, Barnes claims that she had deposits into her bank accounts totaling $26,017.12 that were attributable to reimbursements received from insurance companies but were treated as income by the IRS. She identifies these deposits as follows:

[*46]

| Amount | Source | Bank account | Date deposited |
|--------|--------|--------------|----------------|
| $5,740.61 | Farmers Insurance | 4470 | Jan. 6, 2009 |
| 5,740.61 | Farmers Insurance | 4470 | Jan. 6, 2009 |
| 12,953.64 | Farmers Insurance | 4470 | Jan. 6, 2009 |
| 935.26 | State Farm Insurance | 3054 | Mar. 30, 2009 |
| 57.64 | Farmers Insurance | 9517 | May 26, 2009 |
| 500.00 | Safeco Insurance | 8675 | May 26, 2009 |
| 89.36 | State Farm Insurance | 8675 | Nov. 2, 2009 |

As an initial matter, we conclude that the amounts identified in the table above of $12,953.64, $935.26, $57.64, $500, and $89.36 were deposited into Barnes's bank accounts and were already treated as nontaxable deposits by the IRS in its revised bank-deposits analysis for 2009. Therefore, no adjustment to the IRS's determination of Barnes's unreported income for 2009 is warranted for these amounts.

The remaining amounts identified in the table above are the two $5,740.61 entries. For 2009, the trial record contains a copy of only one check for $5,740.61 that Barnes received from Farmers Insurance on January 5, 2009. Barnes deposited this check into her bank account ending in 4470 on January 6, 2009. We conclude that Barnes included the deposit of this $5,740.61 check twice in the spreadsheet that she contends lists nontaxable deposits treated as income by the

[*47] IRS. The IRS already identified and treated the $5,740.61 deposit attributable to this check as a nontaxable deposit in its revised bank-deposits analysis for 2009. Accordingly, we hold that no adjustment to the IRS's determination of Barnes's unreported income for 2009 is warranted for this $5,740.61 check.

### d. Federal income-tax refunds

Barnes identifies $10,032.71 of bank deposits in 2008 and $15,401.76 of bank deposits in 2009 by date and amount. She contends that these deposits were attributable to federal income-tax refunds and that the IRS treated these deposits as income. We disagree that the IRS treated these deposits as income. We conclude that the IRS already identified and treated deposits of these amounts as nontaxable deposits in its revised bank-deposits analyses. Accordingly, we hold that no adjustments to the IRS's determinations of Barnes's unreported income for 2008 or 2009 are warranted.

### e. Store and merchant refunds

A refund from a merchant of an amount the taxpayer previously paid to the merchant is generally not included in gross income. See Martell v. Commissioner, T.C. Memo. 2013-115, at *21. Although there are exceptions to this general

**[\*48]** proposition, such as the tax-benefit rule, see Frederick v. Commissioner, 101 T.C. 35, 41 (1993), the IRS has not invoked these exceptions.

i.     2008

For 2008, Barnes claims that she had deposits into her bank accounts totaling $1,415.53 that were attributable to nontaxable refunds from stores or merchants but were treated as income by the IRS. She identifies these deposits as follows:

| Amount | Source | Bank account | Date deposited |
|--------|--------|--------------|----------------|
| $13.52 | Quill | 9517 | Feb. 11, 2008 |
| 314.44 | American Express | 9517 | Feb. 20, 2008 |
| 175.00 | Discover | 9517 | Feb. 26, 2008 |
| 16.23 | Office Depot | 9517 | Mar. 24, 2008 |
| 266.06 | American Express | 9517 | Apr. 4, 2008 |
| 290.25 | American Express | 9517 | Apr. 18, 2008 |
| 40.00 | Bank of America | 4470 | Apr. 28, 2008 |
| 20.00 | Bank of America | 4470 | Apr. 28, 2008 |
| 191.50 | Nordstrom | 8675 | July 14, 2008 |
| 21.53 | Target | 4470 | Aug. 7, 2008 |
| 1.22 | AT&T | 9517 | Aug. 16, 2008 |
| 31.98 | Office Depot | 9517 | Dec. 15, 2008 |
| 9.04 | Partyboy | 9517 | Dec. 22, 2008 |
| 10.70 | Walmart | 8675 | Dec. 26, 2008 |
| 14.06 | Target | 8675 | Dec. 29, 2008 |

[*49] As an initial matter, we conclude that the amounts identified in the table above of $13.52, $16.23, $40, $20, $191.50, $21.53, $31.98, $9.04, $10.70, and $14.06 were deposited into Barnes's bank accounts, and were already treated as nontaxable deposits by the IRS in its revised bank-deposits analysis for 2008. Therefore, no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted for these amounts.

The remaining amounts identified in the table above are $314.44, $175, $266.06, $290.25, and $1.22. These amounts total $1,046.97. We conclude that these five amounts were deposited into Barnes's bank accounts and were treated by the IRS as income in its revised bank-deposits analysis for 2008. We discuss below whether these five deposits are includible in income.

We conclude that four of the five deposits listed above (totaling $1,045.75 out of the $1,046.97) are nontaxable store or merchant refunds erroneously treated as income by the IRS. The four deposits totaling $1,045.75 are: (1) a $314.44 refund from American Express deposited into her bank account ending in 9517 on February 20, 2008, (2) a $175 refund from Discover Network deposited into her bank account ending in 9517 on February 26, 2008, (3) a $266.06 refund from American Express deposited into her bank account ending in 9517 on April 4, 2008, and (4) a $290.25 refund from American Express deposited into her bank

[*50] account ending in 9517 on April 18, 2008.[12]  Barnes failed to prove by a

preponderance of the evidence the source of the fifth deposit, which was $1.22.

Accordingly, we hold that the IRS's determination of Barnes's unreported income

for 2008 must be adjusted to exclude $1,045.75.

ii.    2009

For 2009, Barnes claims that she had deposits into her bank accounts

totaling $387.51 that were attributable to nontaxable refunds from stores or

merchants but were treated as income by the IRS.  She identifies these amounts as

follows:

| Amount | Source | Bank account | Date deposited |
|--------|--------|--------------|----------------|
| $107.74 | Bank of America | 9517 | Feb. 10, 2009 |
| 107.74 | Bank of America | 9517 | Feb. 17, 2009 |
| 6.05 | Target | 4470 | June 16, 2009 |
| 65.90 | HSBC Private Label | 8675 | Nov. 12, 2009 |
| 41.65 | American Express | 9517 | Nov. 16, 2009 |
| 25.97 | Quill | 9517 | Dec. 10, 2009 |
| 32.46 | Quill | 9517 | Dec. 11, 2009 |

As an initial matter, we conclude that the amounts identified in the table

above of $6.05, $65.90, $25.97, and $32.46 were deposited into Barnes's bank

---

[12]These are the $1,045.75 in deposits for which the IRS has the burden of proof.  See supra pp. 32-33.

[*51] accounts and were already treated as nontaxable deposits by the IRS in its revised bank-deposits analysis for 2009. Therefore, no adjustment to the IRS's determination of Barnes's unreported income for 2009 is warranted for these amounts.

The remaining amounts identified in the table above are $107.74, $107.74, and $41.65. These amounts total $257.13. However, upon reviewing Barnes's bank statements and the IRS's revised bank-deposit analysis for 2009, we conclude that Barnes actually had deposits totaling $501.65 (instead of the $257.13 erroneously asserted by Barnes) in 2009 that were treated as income by the IRS but are in our view attributable to nontaxable store or merchant refunds. The first such deposit was a $200 refund (erroneously identified by Barnes in her briefs as a deposit of only $107.74, rather than $200) from Bank of America deposited into her bank account ending in 9517 on February 10, 2009. The second such deposit was a $260 refund (also erroneously identified by Barnes in her briefs as a deposit of only $107.74, rather than $260) from Bank of America deposited into her bank account ending in 9517 on February 17, 2009. The third such deposit was a $41.65 refund from American Express deposited into her bank account ending in 9517 on November 16, 2009. These three deposits, totaling $501.65, are nontaxable deposits traceable to store or merchant refunds that were

[*52] erroneously treated as income for 2009 by the IRS.  Accordingly, we hold that the IRS's determination of Barnes's unreported income for 2009 must be adjusted to exclude $501.65.

      f.      <u>"Reimbursements from various sources"</u>

            i.      <u>2008</u>

For 2008, Barnes claims that she had deposits into her bank accounts totaling $747.03 that were attributable to "reimbursements from various sources" but were treated as income by the IRS.  She identifies these deposits as follows:

| Amount | Source | Bank account | Date deposited |
|---|---|---|---|
| $50.00 | Brenda Ozen | 9517 | Jan. 28, 2008 |
| 165.00 | Bank of America | 9517 | Apr. 8, 2008 |
| 339.24 | Wells Fargo | 8675 | Apr. 28, 2008 |
| 127.79 | Verizon | 8675 | July 9, 2008 |
| 65.00 | Ora Robinson | 8675 | July 9, 2008 |

As an initial matter, we conclude that the amounts identified in the table above of $339.24 and $127.79 were deposited into Barnes's bank accounts and were already treated as nontaxable deposits by the IRS in its revised bank-deposits analysis for 2008.  Therefore, no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted for these amounts.

**[\*53]** The remaining amounts identified in the table above are $50, $165, and $65. We address these three amounts below.

We conclude that the amounts of $165 and $65 were deposited into Barnes's bank accounts and were treated as income by the IRS but are, in our view, attributable to nontaxable reimbursements from various sources. The $165 deposit was a $165 refund from Bank of America that was deposited into her bank account ending in 9517 on April 8, 2008. Specific and credible testimony by Barnes established that the $65 deposit was attributable to a $65 reimbursement she received from Ora Robinson (Barnes's aunt) and subsequently deposited into her bank account ending in 8675 on July 9, 2008. Regarding the third deposit, of $50, Barnes contends that she made a $50 deposit into her bank account ending in 9517 on January 28, 2008, that this deposit was attributable to a reimbursement check that she received from Brenda Ozen, and that this deposit was treated as income by the IRS. Barnes did not provide a copy of this $50 check. There is no $50 deposit into Barnes's bank account ending in 9517 on this date. Barnes failed to prove by a preponderance of the evidence that she received a $50 reimbursement check from Brenda Ozen or that she subsequently deposited such a $50 check into any of her bank accounts. Accordingly, we hold that the IRS's

[*54] determination of Barnes's unreported income for 2008 must be adjusted to exclude $230.

        ii.    <u>2009</u>

For 2009, Barnes claims that she had deposits into her bank accounts totaling $317.54 that were attributable to "reimbursements from various sources" but were treated as income by the IRS. She identifies these deposits as follows:

| Amount | Source | Bank account | Date deposited |
|--------|--------|--------------|----------------|
| $92.54 | Unidentified source | 9517 | Jan. 5, 2009 |
| 200.00 | Wells Fargo | 6621 | Mar. 16, 2009 |
| 25.00 | Ora Robinson | 8675 | Sept. 14, 2009 |

There is a deposit of $92.54 into her bank account ending in 9517 on January 5, 2009, but the source of this deposit is not determinable from the bank statements and Barnes did not describe the source of this deposit. There is no check in the record for that amount. There is also a deposit of $200 into her bank account ending in 6621 on March 16, 2009, but we are unable for similar reasons to confirm the source of this deposit. There is no deposit of $25 into Barnes's bank account ending in 8675 on September 14, 2009.

Barnes failed to prove by a preponderance of the evidence that any of these alleged nontaxable amounts were deposited into her bank accounts. Accordingly,

[*55] we hold that no adjustment to the IRS's determination of Barnes's unreported income for 2009 is warranted for these amounts.

g. Repayments of loan principal from clients, friends, and family

Barnes claims that she received, and subsequently deposited into her bank accounts, $8,023 in 2008 and $2,945 in 2009, that these deposits were attributable to repayments of the principal of loans that she had made to clients, friends, and family, and that the IRS treated these deposits as income. Gross income also does not include amounts received as repayments of loans. See, e.g., Commissioner v. Tufts, 461 U.S. at 307.

Barnes testified that she regularly made informal loans to clients, friends, and family members. If Barnes in fact lent money to her friends, family, or clients and was repaid, then the amounts representing repayments are not income. See, e.g., id. Barnes testified that the loans she made were informal, that they were not memorialized by any formal agreements, that she did not charge interest, and that she did not charge penalties for late payments. Barnes claims that when she was repaid for these alleged loans she deposited the repayments into her various bank accounts.

The trial record contains documentary evidence of the existence of only one of these alleged loans; specifically, there is a $500 check from Sylvia Law, a

[*56] friend of hers from church, which Barnes received in 2009, and which Barnes claims was the repayment of a $500 loan to Law.[13]  In her testimony Barnes described only this loan with any specificity.  Barnes credibly testified that she lent Law $500 and that Law subsequently repaid Barnes that same amount.  The $500 check written to Barnes from Law was deposited into Barnes's bank account ending in 8675 on June 2, 2009.  The IRS treated this deposit as income in its revised bank-deposits analysis for 2009.  Given Barnes's testimony and the documentary evidence, we conclude that this $500 deposit was from a nontaxable loan repayment and that it should be excluded from Barnes's income for 2009.

We are unable to determine whether Barnes deposited into her bank accounts any other loan repayments.  The sole evidence that she received any other loan repayments or that she deposited such amounts into her bank accounts is Barnes's uncorroborated testimony (via the spreadsheet).  We are not required to, and do not, rely on Barnes's self-serving and unsubstantiated testimony to establish that she received any other loan repayments or that she deposited such amounts into her bank accounts.  See Tokarski v. Commissioner, 87 T.C. 74, 77

[13]Barnes also attempted to enter into evidence affidavits from six different individuals, each of whom Barnes alleges repaid her for personal loans she made to them.  However, these affidavits were excluded from evidence as inadmissible hearsay.

[*57] (1986). Barnes failed to prove by a preponderance of the evidence that any deposits into the bank accounts used by the IRS in its revised bank-deposits analyses were attributable to nontaxable repayment of loan principal, other than the $500 from Sylvia Law in 2009. In sum, we hold that no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted, but that the IRS's determination of Barnes's unreported income for 2009 should be adjusted to exclude $500.

h.      Redeposit of unused American Express Traveler's checks

Barnes claims that a $250 deposit into her bank account ending in 8675 was attributable to a nontaxable refund for $250 of unused American Express Traveler's checks. The IRS already identified and treated this $250 deposit as nontaxable in its revised bank-deposits analysis for 2008. Accordingly, we hold that no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted.

i.      Reimbursement of attorney's fees paid on behalf of father's estate

The trial record contains a copy of a check that Barnes wrote to Clement Aldridge for $375 on May 22, 2008, that has the word "wills" in the memo line. Barnes identifies Aldridge as the attorney who wrote a will for Titus Barnes. Barnes claims that on June 3, 2008, she received a $375 payment from Jesse

[*58] Walker (an unidentified person whom we assume arguendo was associated with the estate of Titus Barnes) as a reimbursement for this expense and that she deposited this $375 into her bank account ending in 9517 on that same day. There is no $375 deposit into any of Barnes's bank accounts on or around June 3, 2008 (the date that Barnes claimed to have deposited the amount). Barnes failed to prove by a preponderance of the evidence that any deposits into her bank accounts were attributable to this alleged nontaxable reimbursement. Accordingly, we hold that no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted.

j.      Reimbursement for court fees paid on behalf of client

Barnes's spreadsheet, which we treat as her testimony, states that a $100 deposit into her bank account ending in 3054 on August 25, 2008 was attributable to a reimbursement from a client of Barnes & Barnes Financial Services, Tim Hadley, for court fees that Barnes had paid on his behalf. The IRS already identified and treated this $100 deposit as nontaxable in its revised bank-deposits

[*59] analysis for 2008.[14] Accordingly, we hold that no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted.

k.     Gift from cousin

Barnes claims that a $25 deposit into her bank account ending in 8675 on July 21, 2008, was attributable to a nontaxable gift that she received from her cousin, Darnell Barnes. The sole evidence that this $25 deposit was attributable to a nontaxable gift is Barnes's uncorroborated testimony (via the spreadsheet). We are not required to, and do not, rely on Barnes's self-serving and unsubstantiated testimony. See Tokarski v. Commissioner, 87 T.C. at 77. Barnes failed to prove by a preponderance of the evidence that she received this alleged gift or that the $25 deposit that she identified was attributable to a nontaxable gift. Accordingly, we hold that no adjustment to the IRS's determination of Barnes's unreported income for 2008 is warranted.

l.     Deposits "from personal funds or other loans not previously reported"

In her briefs, Barnes asserts that she made various deposits into her bank accounts, totaling $8,509 in 2008 and $5,705 in 2009, all of which, according to

_____

[14]In her briefs, Barnes asserts that this $100 was deposited into her bank account in 2009. The check Barnes received for this payment is dated August 4, 2008, and was deposited into her bank account ending in 3054 on August 25, 2008. Therefore the IRS was correct to subtract this $100 amount from her bank deposits for the 2008 tax year, not the 2009 tax year.

[*60] her, were attributable to "personal funds or other loans not previously reported." Her spreadsheet, which we treat as her testimony, contains information about these deposits, including (1) the date of the deposit, (2) the bank account, (3) the amount of the deposit, and (4) a description of the nontaxable source of the money. A review of the bank statements shows that these deposits listed in her spreadsheet were real deposits. However, the bank-statement deposit entries describe the deposits only as either "Deposit" or "Counter Credit". These descriptions do not aid us in determining whether these deposits were from taxable or nontaxable sources. Furthermore, Barnes's spreadsheet describes the source of these deposits only in vague terms. Each deposit is described in the spreadsheet as both "Cash Personal Funds/Loans" and "Funds from Estate/Loan Repayment". Barnes did not provide any other explanation of the source of these deposits. We are not required to, and do not, rely on Barnes's self-serving and unsubstantiated testimony. See id. We are unconvinced that any of these identified deposits were attributable to nontaxable sources. Accordingly, we hold that no adjustments to the IRS's determinations of Barnes's unreported income for 2008 or 2009 are warranted.

m.    Summary

The table below summarizes our conclusions in part 1.

[*61]

| The Court's conclusions regarding the IRS's revised bank-deposit analyses | | |
|---|---|---|
| | 2008 | 2009 |
| Unreported income as determined by IRS in revised bank deposit analysis | $28,849.21 | $28,258.26 |
| Adjustments by Court for reimbursements by Church in part 1.b | 1,818.75 | 1,354.65 |
| Adjustments by Court for store and merchant refunds in part 1.e | 1,045.75 | 501.65 |
| Adjustments by Court for reimbursements from various sources in part 1.f | 230.00 | -0- |
| Adjustments by Court for repayment of loan principal from clients, friends, and family in part 1.g | -0- | 500.00 |
| Adjustments by Court: Total | 3,094.50 | 2,356.30 |
| Unreported income as determined by Court pursuant to bank-deposit analysis | 25,754.71 | 25,901.96 |

2.  Barnes is not entitled to business-expense deductions for Barnes & Barnes Financial Services for 2008 or 2009 in excess of the amounts the IRS conceded ($15,937 for 2008 and $17,984 for 2009).

Barnes seeks deductions in excess of the amounts the IRS conceded for the following business expenses for Barnes & Barnes Financial Services: car and

**[\*62]** truck expenses for 2008 and 2009, internet expenses for 2008 and 2009, and supplies expenses for 2009.

Unless otherwise indicated, all expenses discussed in this section relate to Barnes & Barnes Financial Services.  As described supra, the parties previously resolved the tax treatment of all expenses reported on the Schedule C for Barnes's financial-consulting work with churches for 2008 and 2009 in the stipulation of settled issues.

Generally, the taxpayer bears the burden of proving that the determinations in the notice of deficiency are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. at 115.  The IRS bears the burden of proof for issues for which the taxpayer shows that the requirements of section 7491(a) are satisfied.  Higbee v. Commissioner, 116 T.C. at 442; see Rolfs v. Commissioner, 135 T.C. at 483 (taxpayer bears burden of proving that requirements of section 7491(a) have been met).  With respect to this issue--the availability of various types of business-expense deductions for Barnes & Barnes Financial Services--Barnes has failed to prove that the requirements of section 7491(a) have been met.  Therefore, Barnes bears the burden of proof with respect to the disputed business-expense deductions for Barnes & Barnes Financial Services.

**[\*63]** a.   Car and truck expenses

Section 162(a) allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred by the taxpayer in carrying on a trade or business. Section 262(a) disallows deductions for personal, living, or family expenses. Costs incurred in traveling between two places of business may be deductible as ordinary and necessary business expenses. See Steinhort v. Commissioner, 335 F.2d 496, 504 (5th Cir. 1964), aff'g T.C. Memo. 1962-233. The costs of traveling between a taxpayer's home and work (i.e., commuting expenses) are personal and are not deductible business expenses. Id. at 504; Heuer v. Commissioner, 32 T.C. 947, 951 (1959), aff'd, 283 F.2d 865 (1960); sec. 1.162-2(e), Income Tax Regs.

Section 6001 requires the taxpayer to maintain records sufficient to establish the amount of each deduction claimed. See also sec. 1.6001-1(a), Income Tax Regs. Under the so-called Cohan rule, if the taxpayer establishes that an expense is deductible but is unable to substantiate the precise amount, the court may estimate the amount, bearing heavily against the taxpayer whose inexactitude is of his or her own making. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). However, section 274(d) overrides the Cohan rule--imposing strict substantiation requirements--with regard to certain expenses. See Sanford v. Commissioner, 50 T.C. 823, 828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir.

**[\*64]** 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014

(Nov. 6, 1985). These expenses include the expenses of operating passenger

automobiles. Sec. 274(d) (any expense with respect to the use of "listed property"

as defined in section 280F(d)(4)); sec. 280F(d)(4)(A)(i) (defining listed property

as including passenger automobiles). Thus, the car and truck expense deductions

Barnes seeks are subject to the strict substantiation requirements of section

274(d).[15] To deduct expenses subject to the strict substantiation requirements of

section 274(d), the taxpayer must substantiate "elements" by one of two methods:

"adequate records" or "sufficient evidence corroborating the taxpayer's own

---

[15]Barnes reported deductions for car and truck expenses on both the Schedules C for her financial-consulting work and her Schedules C for Barnes & Barnes Financial Services. Barnes listed vehicle information on her Schedule Cs for her financial-consulting work for churches (i.e., the date a vehicle was placed in service, June 1, 2008; the miles she drove the vehicle for business for that year; and the total miles she drove the vehicle), but she listed no vehicle information on her Schedules C for Barnes & Barnes Financial Services. We surmise that Barnes intended to report that she used the same vehicle for both her financial-consulting work for churches and for Barnes & Barnes Financial Services and that she reported the information for the vehicle only on the Schedules C for her financial-consulting work for churches. (The deductibility of the "car and truck" expenses reported for Barnes's financial-consulting work with churches has been resolved in the stipulation of settled issues.) Although neither the returns nor the record indicates whether the vehicle was a passenger vehicle, Barnes and the IRS agree that Barnes's reported "car and truck" expenses for Barnes & Barnes Financial Services are subject to the strict substantiation requirements of sec. 274(d). Therefore, we consider Barnes's "car and truck" expenses for Barnes & Barnes Financial Services to be subject to the strict substantiation requirements of sec. 274(d).

[*65] statement". One "element" is the amount of the expenses. Sec. 1.274-5T(b)(6), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985). For the expenses of operating vehicles (including passenger automobiles), the taxpayer has two options for calculating the expenses of operating the vehicle. Sec. 1.274-5(j)(2), Income Tax Regs.; Rev. Proc. 2008-72, sec. 5.02, 2008-2 C.B. (Vol. 2) 1286, 1288; Rev. Proc. 2007-70, sec. 5.02, 2007-2 C.B. 1162, 1164. Under the first option, the taxpayer calculates the actual expenses of using the vehicle for business. Sec. 1.274-5T(b)(6), Temporary Income Tax Regs., supra. Under the second option, the taxpayer calculates the expenses of using the vehicle for business by multiplying the business miles driven by a flat mileage rate set by the IRS. Sec. 1.274-5(j)(2), Income Tax Regs.; Rev. Proc. 2008-72, sec. 5.02 ("A taxpayer generally may deduct an amount equal to * * * the business standard mileage rate times the number of business miles traveled."). Which of these options is chosen by the taxpayer makes a difference as to the "elements" that must be substantiated.

If the taxpayer chooses to calculate the expenses of operating a vehicle using the applicable mileage rate, then the "elements" to be substantiated include:

**[*66]** (1)    the mileage of each business use and the total business and nonbusiness mileage during the taxable year, <u>see</u> sec. 1.274-5(j)(2), Income Tax Regs.; sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., <u>supra</u>,

(2)    the date of each business use of the vehicle, <u>see</u> sec. 1.274-5(j)(2), Income Tax Regs. (use of mileage rate does not relieve taxpayer of obligation to substantiate "time" of business use within meaning of section 274(d)(4)(B)); sec. 1.274-5T(b)(6)(ii), Temporary Income Tax Regs., <u>supra</u> (interpreting "time" of business use in section 274(d)(4)(B) to mean "date of * * * use"), and

(3)    the "business purpose of each use" of the vehicle, sec. 1.274-5(j)(2), Income Tax Regs.; sec. 1.274-5T(6)(iii), Temporary Income Tax Regs.  To meet the "adequate records" requirements of section 274(d) for vehicle expenses, a taxpayer choosing the mileage-rate option must maintain (1) an account book, a diary, a log, a statement of expense, trip sheets, or similar records, and (2) documentary evidence (such as receipts or bills), which, in combination, are sufficient to establish the required "elements", including the mileage, the date, and the business purpose of each business use of the vehicle.  <u>See</u> sec. 1.274-5(j)(2), Income Tax Regs.; sec. 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

**[*67]** The mileage, the date, and the business purpose of each business use of the vehicle must be recorded "at or near the time" of each business use.  See sec. 1.274-5T(c)(2)(ii), Temporary Income Tax Regs., supra.  To be considered made "at or near the time" of each use, the record must be made when the taxpayer had full present knowledge of the mileage, the date, and the business purpose of each business use of the vehicle.  See id. subdiv. (ii)(A).  A record made weekly is considered to satisfy the full present knowledge requirement.  See id.

In the absence of "adequate records" sufficient for purposes of section 274(d), a taxpayer choosing the mileage-rate option must substantiate each of the "elements" (including the mileage, the date, and the business purpose of each business use of the vehicle) by "sufficient evidence corroborating * * * [the taxpayer's] own statement".  Id. subpara. (1).  Substantiation by "sufficient evidence corroborating [the taxpayer's] own statement" requires the taxpayer to establish these elements "(A) [b]y * * * [the taxpayer's] own statement, whether written or oral, containing specific information in detail as to such element; and (B) [b]y other corroborative evidence sufficient to establish such element."  Sec. 1.274-5T(c)(3)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46020 (Nov. 6, 1985).

[*68] Barnes claimed car and truck expense deductions of $6,930 and $6,544 on the Schedules C for Barnes & Barnes Financial Services for 2008 and 2009, respectively. In the notice of deficiency, the IRS disallowed these deductions in full. In the stipulation of facts, the IRS conceded that Barnes is entitled to deductions for Barnes & Barnes Financial Services for car and truck expenses of $3,465 for 2008 and $3,277 for 2009.

During trial Barnes offered two sets of spreadsheets listing her alleged car and truck expenses for Barnes & Barnes Financial Services for 2008 and 2009. Both were admitted into evidence. The first set of mileage spreadsheets contains Barnes's calculations that she is entitled to deductions for Barnes & Barnes Financial Services for car and truck expenses of $7,100.95 for 2008 and $6,544.34 for 2009. The second set of mileage spreadsheets contains Barnes's calculations that she is entitled to deductions for Barnes & Barnes Financial Services for car and truck expenses of $6,582.26 for 2008 and $6,504.74 for 2009. Barnes explained during trial that the difference between the second set of mileage spreadsheets and the first is that the second omits some of the trips listed in the first that the IRS disputed as to deductibility. From this explanation we conclude that Barnes concedes that expenses for the trips removed from the first set of

**[*69]** mileage spreadsheets are nondeductible.  Thus, it is the second set of

mileage spreadsheets that presents Barnes's position as of the trial.

For each trip, the second set of mileage spreadsheets describes:

- the date of each trip,

- the starting point and destination for each trip (e.g., "Drove from

  Baytown [her accounting job for Robert Half at the Exxon Mobil

  refinery in Baytown] to office [Barnes & Barnes Financial Services's

  office in Houston]"),

- the miles driven on each trip, and

- the amount of the annual expense incurred on the basis of standard

  mileage rates.[16]

Most of the listed trips are from Barnes's accounting job for Robert Half at the

Exxon Mobil refinery in Baytown to Barnes & Barnes Financial Services's office

in Houston (a 36-mile trip).  Other trips are listed in the second set of mileage

spreadsheets as well.  In total, the second set of mileage spreadsheets states that

---

[16]It appears that this amount is equal to the miles driven multiplied by the standard mileage rate, which was 50.5 cents per mile for the first six months in 2008, Rev. Proc. 2007-70, sec. 2.01(1), 2007-2 C.B. 1162, 1163, 58.5 cents per mile for the last six months in 2008, IRS Announcement 2008-63, 2008-2 C.B. 114, 114, and 55 cents per mile for 2009, Rev. Proc. 2008-72, sec. 2.01(1), 2008-2 C.B. (Vol. 2) 1286, 1286.

**[*70]** Barnes drove 12,346.8 business miles in 2008 and 11,826.8 business miles in 2009.

In her post-trial briefs Barnes concedes that expenses for trips from her church to the office of Barnes & Barnes Financial Services are nondeductible. She claims that after accounting for this concession, her deductible car and truck expenses are $6,002.96 for 2008 (compared to $6,582.26 in the second set of mileage spreadsheets) and $5,942.92 for 2009 (compared to $6,504.74 in the second set of mileage spreadsheets).

It appears that Barnes did not create the second set of mileage spreadsheets contemporaneously with the trips they purport to record. The second set of mileage spreadsheets is not dated and Barnes did not testify as to when she prepared the mileage spreadsheets. Attached to the first set of mileage spreadsheets were two blank calendars that had been printed from the website http://www.timeanddate.com on March 5, 2014. These calendars were not attached to the second set of mileage spreadsheets, but the second set was a revised version of the first set, and therefore the second set postdates the first set. That means that the second set of mileage spreadsheets was prepared sometime after the two calendars attached to the first set of mileage spreadsheets were printed, i.e., March 5, 2014, which is several years after the trips in question. The

**[\*71]** record does not indicate what information Barnes used to compile the first or second set of mileage spreadsheets. It is implausible that five to six years after the alleged business trips took place Barnes had full present knowledge of the dates of the trips, the miles traveled, or the business purpose of these trips. See sec. 1.274-5T(c)(2)(ii)(A), Temporary Income Tax Regs., supra. The mileage spreadsheets therefore were not prepared at or near the time of the trips the spreadsheets were meant to record. The mileage spreadsheets are therefore not adequate records of the trips. Id. Barnes provided no evidence to corroborate her mileage spreadsheets. Therefore, there is insufficient evidence corroborating Barnes's own statement, i.e., the mileage spreadsheets. See id. subpara. (3)(i). Barnes's mileage spreadsheets do not satisfy the strict substantiation requirements of section 274(d). Accordingly, we hold that Barnes is not entitled to deductions for Barnes & Barnes Financial Services for car and truck expenses beyond the amounts the IRS conceded in the stipulation of facts, i.e., $3,465 for 2008 and $3,277 for 2009.

b. Internet

Internet expenses have been characterized as utility expenses rather than expenses related to the use of listed property (such as computer equipment). See Verma v. Commissioner, T.C. Memo. 2001-132, slip op. at 12. So characterized, internet expenses are not governed by the strict substantiation rules of section

[*72] 274(d).  Therefore, pursuant to the <u>Cohan</u> rule the amount of deductible internet expenses can be estimated by a court, provided, however, that the court has a reasonable basis for making an estimate of the amount of the expense related to business use.  See <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985) (estimate must have reasonable evidentiary basis).

At trial and in her post-trial briefs Barnes contends that she is entitled to business-expense deductions for Barnes & Barnes Financial Services of $311.64 in each of 2008 and 2009 for expenses she incurred for internet service at her personal residence.  Barnes did not claim an internet-expense deduction on any of the Schedules C attached to her 2008 or 2009 tax return.  And Barnes did not raise a claim to internet-expense deductions in her petition.  However, the IRS does not contend that this failure to plead the deductibility of internet expenses bars the Court from considering the issue.

The IRS does not appear to dispute that Barnes actually paid $311.64 in both 2008 and 2009 for internet service at her personal residence.  The IRS contends that Barnes has not shown that she used the internet at her personal residence for business purposes and accordingly is not entitled to a business-expense deduction for these expenses.

**[\*73]** Barnes testified that she used the internet at her personal residence for business purposes (i.e., conducting research and transmitting tax returns) and for personal purposes. However, Barnes did not provide us with a reasonable evidentiary basis for estimating the portion of time that the internet at her personal residence was used for business purposes. Accordingly, we hold that Barnes is not entitled to a deduction for Barnes & Barnes Financial Services for any portion of her home internet expenses for 2008 or 2009. See id. at 742-743 (estimate must have reasonable evidentiary basis).

    c.    <u>Supplies</u>

Barnes claimed a supplies-expense deduction of $2,503 on the Schedule C for Barnes & Barnes Financial Services for 2009. The Schedule C did not include an itemized list of the supplies expenses. In the notice of deficiency, the IRS allowed a deduction of $672. The notice of deficiency did not indicate which particular supplies expenses corresponded to the $672 allowance. In the stipulation of facts the IRS agreed that Barnes was entitled to a supplies-expense deduction for Barnes & Barnes Financial Services of $3,752. The stipulation of facts itself did not indicate which particular supplies expenses corresponded to the $3,752 concession. However, the IRS would clarify this during trial, as explained below.

[*74] At trial Barnes asserted that she is entitled to a total supplies-expense deduction of $4,861.93 for Barnes & Barnes Financial Services for 2009.[17]  Barnes produced a spreadsheet listing a total of 48 expenses that she claimed to have paid or incurred for business supplies for Barnes & Barnes Financial Services during 2009.  Expenses listed on this spreadsheet were for, among other things, a "DVD player", "toner", "supplies", "earphones", "business equipment property taxes", and "software".  The sum of the expenses listed on the spreadsheet is $4,861.93.  Pursuant to an agreement of the parties made on the record at trial, the Court treats this spreadsheet as if Barnes had testified to the information contained in the spreadsheet.[18]

As explained above, the IRS has agreed in the stipulation of facts that Barnes is entitled to a supplies-expense deduction of $3,752.  At trial, the IRS stated that the $3,752 concession is based in part on its concession that 33 of the 48 expenses on Barnes's spreadsheet are deductible.  The total expense

_____

[17]In her post-trial briefs, Barnes continued to assert that she is entitled to a total supplies-expense deduction of $4,861.93 for Barnes & Barnes Financial Services for 2009.  In Barnes's first post-trial brief she also included the number "$4,830.54" in a table that lists the amount she claims she is entitled to deduct for supplies for 2009.  Barnes did not explain this number or itemize this amount.

[18]This agreement is similar to the agreement with respect to another spreadsheet prepared by Barnes with respect to her alleged sources of nontaxable deposits.  We described that agreement supra note 9.

[*75] corresponding to these 33 expenses is $3,710.85. This leaves $41.15 of the $3,752 concession unaccounted for.[19] It is unnecessary for us to consider the deductibility of the 33 expenses the IRS concedes are deductible. Our task is instead to determine the deductible amount of the 15 unconceded expenses. If this amount exceeds the remaining IRS concession of $41.15, then Barnes is entitled to a supplies-expense deduction greater than the $3,752 amount of the IRS concession. Below is the information in Barnes's spreadsheet, with the 15 disputed expenses in bold.

| Date | Payee | Description | Amount |
|------|-------|-------------|--------|
| Jan. 6, 2009 | Coastal Teacher | Supplies | $8.42 |
| Jan. 12, 2009 | Acme Business | Business cards | 64.95 |
| Jan. 12, 2009 | Staples | Supplies | 77.92 |
| **Jan. 19, 2009** | **Office Depot** | **Supplies** | **15.24** |
| Jan. 26, 2009 | Office Depot | Copy paper | 101.21 |
| Feb. 9, 2009 | Quill Corp. | 5606 Tax forms W-2 6-pt laser | 20.88 |
| Feb. 10, 2009 | Quill Corp. | Tax forms laser link software and forms | 68.61 |
| **Feb. 25, 2009** | **Walmart Sam's Club** | **Supplies** | **60.53** |
| **Mar. 2, 2009** | **Amegy Harris County** | **Business equipment property taxes** | **23.54** |
| Mar. 9, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |

---

[19]$3,752 − $3,710.85 is $41.15.

| [*76] | | | |
|---|---|---|---|
| **Mar. 12, 2009** | **Apple Store** | **Earphones** | **31.39** |
| **Mar. 12, 2009** | **Apple Store** | **Supplies** | **31.39** |
| **Mar. 17, 2009** | **Office Depot** | **Toner** | **276.11** |
| Mar. 31, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| Apr. 6, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| Apr. 6, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| **Apr. 17, 2009** | **Office Depot** | **Norton Virus Protection software and envelopes** | **116.89** |
| Apr. 17, 2009 | Norton Software | Norton Virus Protection software renewal | 49.99 |
| Apr. 27, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| Apr. 27, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| May 1, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| May 1, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| June 2, 2009 | Office Depot | Binding combs | 4.78 |
| June 2, 2009 | Office Depot | Presentation envelopes | 286.77 |
| June 4, 2009 | Office Depot | Business card stock | 7.99 |
| June 4, 2009 | Dollar Tree Stores | Pens for office | 29.23 |
| June 15, 2009 | HiEd Software Co. | Microsoft Office Enterprise | 15.16 |
| **June 15, 2009** | **Best Buy** | **Software** | **212.11** |
| June 17, 2009 | Micro Electron | Palm Pilot to store tax contacts and Data Storage System | 539.98 |
| **June 25, 2009** | **Target** | **Haier DVD player for training** | **140.71** |
| June 30, 2009 | Proseries Software Sales | Proseries Professional Edition | 1,406.17 |
| July 2, 2009 | FedEx Kinko's | Copies | 16.37 |
| **Aug. 15, 2009** | **Apple Store** | **Glare screen** | **16.18** |

| [*77] | | | |
|---|---|---|---|
| Sept. 22, 2009 | Proseries Software Sales | Pay per return - business return | 49.80 |
| Sept. 22, 2009 | Proseries Software Sales | Pay per return - business return | 3.25 |
| **Sept. 27, 2009** | **Target** | **Surge protectors for office** | **35.70** |
| Oct. 27, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| **Oct. 30, 2009** | **City Office Supply** | **Office supplies** | **11.90** |
| **Nov. 6, 2009** | **Staples** | **Office organizers** | **77.92** |
| Nov. 16, 2009 | Quill Corp. | Binding covers | 141.32 |
| **Nov. 17, 2009** | **Office Depot** | **Toner** | **89.56** |
| Nov. 19, 2009 | Quill Corp. | Matte texture binding spines | 25.97 |
| Nov. 23, 2009 | GBC | Binding supplies | 58.05 |
| Nov. 24, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| **Dec. 5, 2009** | **Target** | **Batteries** | **11.91** |
| Dec. 17, 2009 | Quill Corp. | 1203-4 LSR Link software; tax forms; binding spines | 86.66 |
| [no date given] | Office Depot | Toner | 290.09 |
| Dec. 28, 2009 | Proseries Software Sales | Pay per return - business return | 32.48 |
| | Total | | 4,861.93 |

We proceed to determine which, if any, of the 15 disputed supplies expenses are deductible under section 162(a). These correspond to the bolded entries in the last table.

As an initial matter, we conclude that the second entry of $31.39 from the Apple Store was a duplicate. Accordingly, Barnes is not entitled to a deduction for the second $31.39 entry. We also conclude that Barnes is not entitled to a

[*78] deduction for the $116.89 expense at Office Depot because the receipt indicates that this expense was subsequently refunded to Barnes. The remaining 13 expenses total $1,002.80. The record contains corroborating evidence of payment (in the form of evidence other than the spreadsheet, such as receipts or copies of checks) of only $215.43 out of this $1,002.80 amount. Barnes did not provide corroborating evidence of payment for the remaining $787.37 amount, i.e., $1,002.80 – $215.43. We are not required to, and do not, rely on Barnes's self-serving and unsubstantiated testimony (through the form of her spreadsheet) to establish that the uncorroborated $787.37 in disputed expenses was paid or incurred by Barnes. See Tokarski v. Commissioner, 87 T.C. at 77. Therefore, we find by a preponderance of the evidence that Barnes paid only $215.43 out of the $1,002.80 amount.

The documentary evidence for these $215.43 in purchases is:

- a check for $15.24 written to Office Depot for a purchase that according to the spreadsheet was for "Supplies",

- a receipt for $31.39 from the Apple Store for earphones,

- a receipt for $140.71 from Target that, according to the spreadsheet, was for a DVD player,

[*79] • a receipt for $16.18 from the Apple Store for a protective phone screen, and

• a receipt for $11.91 for batteries from Target.

The documentary evidence shows that the items were purchased but does not show that they were purchased for business purposes. The mere fact that an item was purchased does not mean the expense is deductible under section 162(a). The expense must be an expense of Barnes's business and not a personal expense. See secs. 162(a), 262(a). The sole purchase listed above about which Barnes testified with any specificity was the DVD player she purchased from Target for $140.71. The IRS does not appear to contest whether Barnes actually incurred an expense of $140.71 for this DVD player. The IRS disputes the deductibility of this expense because it argues that Barnes purchased the DVD player for personal, rather than business, purposes. At trial, Barnes testified that she bought the DVD player in order to "do [continuing-education] units" for training purposes, and "because I didn't have a DVD player on my television or in my home." We do not know where Barnes kept the DVD player. She may have kept it at her house. Without knowing the location of the DVD player, it is difficult to say that Barnes

[*80] did not buy and use the DVD player for substantial personal use. We conclude on the basis of the record that this was a personal expense.[20]

For the remainder of the $215.43 amount, Barnes failed to prove that these were business expenses. Given the record, we are unable to determine the business purpose of her purchase of "[s]upplies", earphones, a protective phone screen, or batteries. Without this knowledge, it is difficult to say that Barnes did not purchase these items for personal use. Barnes has failed to prove by a preponderance of the evidence that these expenses were business expenses, and she is therefore not entitled to a business-expense deduction for them.

Barnes has failed to prove by a preponderance of the evidence that she is entitled to deductions for any of the disputed supplies expenses for Barnes & Barnes Financial Services for 2009. Accordingly, we hold that she is not entitled to a deduction for supplies expenses for Barnes & Barnes Financial Services for 2009 in excess of the $3,752 the IRS already conceded in the stipulation of facts.

---

[20]We note that although the IRS does not contend that the DVD player is listed property, it appears that a tenable argument could be made that a DVD player is "property of a type generally used for purposes of entertainment, recreation, or amusement". See sec. 280F(d)(4)(iii). If a DVD player were listed property, then deductions for the expense of a DVD player would be subject to the strict substantiation requirements of sec. 274(d). See sec. 274(d)(4).

**[*81]** 3.    <u>Barnes is not entitled to charitable-contribution deductions for 2008 or 2009 in excess of the amounts allowed in the notice of deficiency ($12,576 for 2008 and $16,381 for 2009)</u>.

Section 170(a)(1) allows a deduction for any "charitable contribution" made by the taxpayer during the taxable year.  A "charitable contribution" is defined as "a contribution or gift to or for the use of" a charitable organization.  Sec. 170(c). One type of charitable contribution is donating money or property directly to a charitable organization.  A second type of charitable contribution is placing money or property in trust for a charitable organization.  Such a transfer is, pursuant to section 170(c), a contribution "for the use of" a charitable organization.  See <u>Davis v. United States</u>, 495 U.S. 472, 485 (1990).  A third type of charitable contribution may arise when a taxpayer performing services for a charitable organization incurs unreimbursed expenses.  Section 1.170A-1(g), Income Tax Regs., is consistent with this, stating:  "No deduction is allowable under section 170 for a contribution of services.  However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution."  The expenses of rendering services are deductible because they constitute contributions "to" the charitable organization in the words of section 170(c).  <u>Van Dusen v. Commissioner</u>, 136 T.C. 515, 523 n.14 (2011).

[*82] Section 170(f)(8)(A) provides that "[n]o deduction shall be allowed under * * * [section 170(a)] for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that meets the requirements of * * * [section 170(f)(8)(B)]."[21] Section 170(f)(8)(B) requires a donee organization's written acknowledgment to state the amount contributed, indicate whether the donee organization provided any goods or services in consideration, in whole or in part, for the contribution, and include a description and good-faith estimate of the value of any goods or services provided by the donee organization. Section 170(f)(8)(C) provides that a written acknowledgment is considered contemporaneous if it was obtained by the taxpayer on or before the earlier of (1) the date the taxpayer filed the original return for the taxable year of the contribution, or (2) the due date (including extensions) for filing the original return for the year. See also sec. 1.170A-13(f)(3), Income Tax Regs. Pursuant to section 1.170A-13(f)(10), Income Tax Regs., a taxpayer who incurs unreimbursed

---

[21]Sec. 170(f)(8)(D) provides that a taxpayer is relieved of the obligation to substantiate his or her contribution with the contemporary written acknowledgment required by sec. 170(f)(8)(A) if the donee organization reports the contribution on a return filed in accordance with the regulations. Barnes does not assert, and the evidence in the record does not suggest, that Williams Temple Church filed any such return. Therefore, this exception is inapplicable here.

[*83] expenses "incident to the rendition of [charitable] services" is treated as having obtained a contemporaneous written acknowledgment of the contributed expenses, in satisfaction of the requirements of section 170(f)(8)(A), if the taxpayer (1) "Has adequate records * * * to substantiate the amount of the expenditures", and (2) acquires a contemporaneous written acknowledgment from the donee organization containing (A) a description of the services provided by the taxpayer, (B) a statement of whether the donee organization provides any goods or services in consideration, in whole or in part, for the unreimbursed expenditures, and (C) a description and good-faith estimate of the value of any goods or services provided by the donee organization.

Generally, the taxpayer bears the burden of proving that the determinations in the notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. at 115. However, the IRS bears the burden of proof on issues for which the taxpayer shows that the requirements of section 7491(a) are satisfied. Higbee v. Commissioner, 116 T.C. at 442; see Rolfs v. Commissioner, 135 T.C. at 483 (taxpayer bears burden of proving that requirements of section 7491(a) have been met). With respect to this issue--the availability of charitable-contribution deductions--we conclude that Barnes has failed to prove that the requirements of

[*84] section 7491(a) have been met.  Therefore, Barnes bears the burden of proof with respect to the charitable-contribution deductions.

      d.    <u>2008</u>

On the Schedule A attached to her 2008 tax return Barnes claimed a total charitable-contribution deduction of $16,727.  Because the Schedule A did not contain an itemized list of contributions, we cannot tell what contributions form the $16,727 total.  In the notice of deficiency, the IRS allowed a charitable-contribution deduction of $12,576 for 2008.  Because the notice of deficiency did not itemize any particular contributions, we cannot tell which contributions were determined to be deductible as part of the $12,576 total.  However, at trial the IRS conceded that the Court should treat the notice of deficiency as having determined that Barnes was entitled to a deduction of $961 for a church trip costing $5,112, and as having determined that Barnes was entitled to a deduction of $11,615 for charitable contributions unrelated to the church trip.  The IRS further stated that even though it considered the $961 allowance of a deduction for the church trip in the notice of deficiency to be an error, it would not contest the deductibility of the $961.  Also, the IRS stated that it does not contest the deductibility of the $11,615 of charitable contributions unrelated to the church trip.  The only contribution for which Barnes seeks a deduction (besides the amounts allowed in the notice of

[*85] deficiency) is the remaining $4,151 cost of the church trip. Our task therefore is to determine how much, if any, of the total $5,112 cost of this church trip Barnes may deduct. If the deductible portion of this $5,112 cost exceeds $961, then Barnes's charitable-contribution deduction for 2008 would exceed the $12,576 allowed in the notice of deficiency.

Barnes visited Dar es Salaam, Tanzania, and Nairobi, Kenya, on the trip. The trial record contains descriptions of the sites that she visited as well as numerous photographs, presumably taken during site visits. Part of the trip consisted of visits to orphanages and schools. However, Barnes also went on at least one safari during this trip.

Barnes paid $5,112 to Genesis Travel for the trip. The trip was organized by Williams Temple Church. In exchange for her $5,112 payment, Barnes received airplane tickets, meals, and lodging.

The IRS does not contest whether Barnes made this $5,112 payment for the church trip in 2008. Rather, the IRS argues that parts of this trip were personal and that Barnes has not provided a contemporaneous written acknowledgment from the donee organization, Williams Temple Church, that satisfies section 170(f)(8)(A).

[*86] Barnes did not contribute money or property directly to Williams Temple Church for this trip. Instead she paid a third party, Genesis Travel, for the expenses associated with this trip. Thus Barnes is entitled to a charitable-contribution deduction only if these expenses were, in the words of section 1.170A-1(g), Income Tax Regs., "expenditures made incident to the rendition of services" to Williams Temple Church. We assume, arguendo, that at least part of the trip was incident to the rendition of services to Williams Temple Church, and therefore a portion of the expenses of the trip would generally be considered deductible as expenses incurred by a church member on a church trip. See, e.g., Smith v. Commissioner, 60 T.C. 988, 993-994 (1973). However, even under this favorable assumption, Barnes would still need to satisfy the contemporaneous written acknowledgment requirement.

In her post-trial brief Barnes alleges, without citing any part of the record, that she provided adequate substantiation under section 170(f)(8) to deduct the cost of this trip. The trial record contains a letter from Williams Temple Church to the IRS which states that Barnes paid $5,112 to go on this trip. This letter does not contain a "description of the services provided by * * * [Barnes]", a "statement of whether or not * * * [Williams Temple Church] provide[d] any goods or services in consideration, in whole or in part, for the unreimbursed expenditures",

[*87] or a "description and good faith estimate of the value of any goods or services provided by * * * [Williams Temple Church]." See sec. 1.170A-13(f)(10), Income Tax Regs. Therefore, the contents of this letter fail to meet the requirements of a contemporaneous written acknowledgment for purposes of section 1.170A-13(f)(10), Income Tax Regs. Furthermore, this letter does not state "[w]hether the donee organization provided any goods or services in consideration, in whole or in part" or provide "[a] description and good faith estimate of the value of any goods or services * * * [provided by the donee organization] or, if such goods or services consist solely of intangible religious benefits, a statement to that effect." See sec. 170(f)(8)(B)(ii) and (iii). Therefore, the contents of this letter also fail to meet the requirements of a contemporaneous written acknowledgment set forth by section 170(f)(8)(B). And lastly, this letter is dated December 15, 2010. The due date for Barnes to file her 2008 tax return was April 15, 2009, and she filed her return on September 11, 2010. The earlier of these two dates is April 15, 2009. Therefore, pursuant to section 170(f)(8)(C), the date by which Barnes was required to obtain a written acknowledgment from Williams Temple Church was April 15, 2009. This letter, dated December 15, 2010, is not a contemporaneous written acknowledgment under section 170(f)(8)(C).

[*88] Barnes failed to substantiate her $5,112 payment for the church trip with a contemporaneous written acknowledgment from Williams Temple Church, as required by section 170(f)(8)(A). Therefore, Barnes is not entitled to a charitable-contribution deduction for this payment. See sec. 170(f)(8)(A). Accordingly, we hold that Barnes is not entitled a charitable-contribution deduction for 2008 in excess of the $12,576 allowed by the IRS in the notice of deficiency.

    e.    <u>2009</u>

Barnes reported a charitable-contribution deduction of $17,766 on the Schedule A attached to her 2009 tax return. In the notice of deficiency, the IRS allowed a charitable-contribution deduction of $16,381 for 2009. At trial and in her post-trial briefs Barnes contends that she is entitled to a charitable-contribution deduction of $20,581 for 2009, without explaining how this number was calculated or why it is greater than the amount she reported on her tax return. In her post-trial briefs, her contention is found in the following statement: "The issue remains whether petitioner is entitled to Schedule A deductions for contributions in the amount of $17,226.00 and <u>$20,581.00</u> for the years 2008 and 2009, respectively, rather than $12,576.45 and $16,380.99 as reported from the audit analysis." (Emphasis added.) Also in her post-trial briefs, Barnes claims: "During the court hearing, the IRS conceded the 2009 amount claimed [i.e.,

[*89] $20,581] (Trans. p. 66)." This is incorrect. At no point has the IRS conceded that Barnes is entitled to a deduction for charitable contributions in excess of the $16,381 allowed in the notice of deficiency for 2009. The IRS has consistently asserted through the course of this litigation that Barnes is entitled to a charitable-contribution deduction of only the $16,381 allowed in the notice of deficiency.

The trial record contains 227 pages of copies of cashed checks, identified as Exhibit 9-J, adduced by Barnes in an attempt to substantiate her charitable contributions for 2009. The parties stipulated that Exhibit 9-J consists of "copies of cancelled checks which petitioner claims are charitable contributions for * * * 2009". The checks in Exhibit 9-J total $17,983.99, which is $1,602.99 more than the $16,381 that the IRS allowed in the notice of deficiency. Most of these checks were written to various churches, including Williams Temple Church.

Barnes must prove entitlement to deduct at least $16,382 in order to be allowed a deduction of even one dollar more than the $16,381 deduction allowed in the notice of deficiency. We easily conclude that at least $6,844 of the $17,983.99 in checks fails to satisfy the requirements of section 170 for charitable-contribution deductions. This $6,844 is the total of checks in the following amounts: $600, $500, $300, $250, $500, $400, $1,009, $500, and $500 paid to

[*90] Williams Temple Church (totaling $4,559), a check for $1,000 paid to Save Africa's Children, a check for $300 paid to "Holy Redeemer", a check for $350 paid to Southern California First, a check for $350 paid to the order of "Cash" (and unaccompanied by corroborating evidence that the payment was made to a charitable organization), and a check for $285 to Texas Southeast First. Barnes did not provide the required contemporaneous written acknowledgment by the relevant donee organization of any of the alleged contributions listed above, all of which exceed $250. See sec. 170(f)(8)(A). Once these $6,844 worth of checks is removed from the larger set of $17,983.99, Barnes is left with only $11,139.99 in checks for which a charitable-contribution deduction could be taken. Even if a deduction were available for this $11,139.99, it falls well short of the $16,381 deduction already allowed by the IRS in the notice of deficiency.

Barnes failed to prove by a preponderance of the evidence that she is entitled to a charitable-contribution deduction for 2009 beyond the amount allowed by the IRS in the notice of deficiency. Accordingly, we hold that Barnes is not entitled to a charitable-contribution deduction for 2009 in excess of the $16,381 allowed by the IRS in the notice of deficiency.

[*91] 4.     <u>Barnes is not entitled to rental-property-expense deductions (that is, deductions for the expenses of owning rental property) for 2008 or 2009, except that Barnes is entitled to a $932.49 deduction for real-property taxes for 2009</u>.

Section 212(2) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year for the management, conservation, or maintenance of property held for the production of income, such as rental property.

Section 280A(a) provides:

> SEC. 280A(a).  General Rule.--Except as otherwise provided in this section, in the case of a taxpayer who is an individual * * *, no deduction otherwise allowable under this chapter [i.e., Chapter 1 of the Code, which includes section 212] shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence.

Section 280A(b) provides:

> SEC. 280A(b).  Exception for Interest, Taxes, Casualty Losses, Etc.--Subsection (a) shall not apply to any deduction allowable to the taxpayer without regard to its connection with his trade or business (or with his income-producing activity).

Section 164(a)(1) allows a deduction for certain taxes, including state and local property taxes, regardless of whether the taxes were paid or incurred in connection with a trade or business or income-producing activity.  See <u>Tschetter v. Commissioner</u>, T.C. Memo. 2003-326, slip op. at 21.  Therefore, section 280A(a)

[*92] does not limit deductions for property taxes. See secs. 164(a)(1), 280A(b); DiDonato v. Commissioner, T.C. Memo. 2013-11, at *96.

The Durham Drive property includes a dwelling unit within the meaning of section 280A. See sec. 280A(f)(1)(A) (a dwelling unit for purposes of section 280A includes a house and all structures or other property appurtenant to such house). A dwelling unit is used by the taxpayer as a residence during the taxable year if the taxpayer uses it for personal purposes for more than the greater of (a) 14 days during the taxable year or (b) 10% of the number of days during the taxable year that the unit is rented at a fair rental value. Sec. 280A(d)(1)(A) and (B). A taxpayer is deemed to have used a dwelling unit for personal purposes for each day that the unit is used by another individual who pays rent for the day below fair rental value. Sec. 280A(d)(2)(C). Whether a dwelling unit is rented for fair rental value is determined by considering the facts and circumstances of each case, sec. 280A(d)(2)(C), including comparable rents in the area, see, e.g., Langley v. Commissioner, T.C. Memo. 2013-22, at *6.

Barnes reported rental income and expenses for the Durham Drive property on the Schedule E of her 2008 tax return and the Schedule E of her 2009 tax return. For 2008, Barnes reported rents received for the Durham Drive property of $800 and total expenses for the Durham Drive property of $10,274, and claimed a

[*93] net rental-property loss of $9,474, i.e., $10,274 – $800.  For 2009, Barnes

reported rents received for the Durham Drive property of $1,000 and total

expenses for the Durham Drive property of $10,151 (including $1,094 for property

taxes) and claimed a net rental-property-loss of $9,151, i.e., $10,151 – $1,000.

In the notice of deficiency, the IRS (1) disallowed all rental-property-

expense deductions Barnes claimed for both 2008 and 2009, and (2) re-

characterized the amounts Barnes reported as rental income for both 2008 ($800)

and 2009 ($1,000) as Barnes's "other income" instead of as rental income.

Generally, the taxpayer bears the burden of proving that the determinations

in the notice of deficiency are erroneous.  Rule 142(a); Welch v. Helvering, 290

U.S. at 115.  The IRS bears the burden of proof for issues for which the taxpayer

shows that the requirements of section 7491(a) are satisfied.  Higbee v.

Commissioner, 116 T.C. at 442; see Rolfs v. Commissioner, 135 T.C. at 483

(taxpayer bears burden of proving that requirements of section 7491(a) have been

met).  With respect to the tax treatment of Barnes's rental income and expenses for

the Durham Drive property we conclude that Barnes has failed to prove that the

requirements of section 7491(a) have been met.  Therefore, Barnes bears the

burden of proof with respect to the rental-property-expense deductions.

**[*94]** At trial Barnes presented documentary proof of payment for expenses related to the Durham Drive property of only $1,325 for 2008 and $2,287 for 2009. In her post-trial briefs Barnes continued to claim that she was entitled to rental-property-expense deductions of $10,274 and $10,151 for 2008 and 2009, respectively, the amounts she had reported on her tax returns.

The IRS contends that section 280A(a) bars Barnes from deducting expenses attributable to the Durham Drive property because, according to the IRS, the rent Barnes charged to her tenant (a cousin named Timothy Dixon) was below the fair-rental value of the property. The IRS raises no other argument that the deductions Barnes claimed as the expenses of the Durham Drive property should be disallowed.

As discussed <u>supra</u>, Barnes inherited a 50% interest in the Durham Drive property from her father upon his death in 2001. Cassandra Mallett, Barnes's sister, inherited the other 50% interest in the Durham Drive property. Her father's will gave Barnes the option to buy her sister's ownership interest in the Durham Drive property for $16,000. But Barnes did not buy her sister's ownership interest in the Durham Drive property until 2013. Thus, at all times during the 2008 and 2009 tax years Barnes and her sister each held a 50% interest in the Durham Drive property.

[*95] Barnes rented the Durham Drive property to her cousin, Timothy Dixon, during 2008 and 2009. She charged Dixon $200 per month in rent. At $200 per month, Dixon should have paid $2,400 in each year. But Barnes received from Dixon rent of only $800 for 2008 and $1,000 for 2009.[22] Despite Dixon's failure to pay the full rent, Barnes never began eviction proceedings against him.

The evidence at trial demonstrates that the Durham Drive property was worth at least $275,000 in 2008 and 2009.[23] As we have said, Barnes bears the

[22]In the notice of deficiency the IRS, consistent with the amounts reported on Barnes's tax returns, included in Barnes's income the total rents that Barnes received for the Durham Drive property--$800 for 2008 and $1,000 for 2009. Barnes did not argue that she should include only 50% of the rents in her income (because her sister owned 50% of the property in 2008 and 2009). Therefore, we sustain the IRS's uncontested determinations, consistent with Barnes's tax returns, that 100% of the rents received for the Durham Drive property are includible in Barnes's income.

[23]Neither party takes a position regarding the value of the Durham Drive property, but several documents were provided at trial and admitted into evidence that relate to the value of the Durham Drive property. According to electronic printouts from the website http://www.hcad.org/records, the value of the Durham Drive property (both the land and the structure) was $276,176 as of both January 1, 2008 and 2009. According to a document titled "Duplicate Tax Receipts" from the Harris County Tax Assessor-Collector, the tax value of the Durham Drive property was $276,176 in 2008 and 2009. According to the summary page for an insurance policy that Barnes purchased for the Durham Drive property from Farmers Insurance Exchange, the value of the Durham Drive property was estimated to be $283,000 in 2008 and $288,000 in 2009.

Although it is true that Barnes bought her sister's one-half interest in the Durham Drive property in 2013 (for $3,000), this purchase (between sisters) is not

(continued...)

**[\*96]** burden of proving the fair rental value of Durham Drive property. See Rule 142(a). Although Barnes attempted to explain that she had to rent out the Durham Drive property at a low rent because of damage to the house, she did not give details regarding the damage. The alleged damage is not readily discernable from the pictures she introduced. We do not know how much it would have cost Barnes (or any tenant) to repair the alleged damage. (If it would have cost very little to repair the damage, then the damage would not have justified a substantial reduction in rent.) Additionally there is no evidence in the record of the market rent for houses comparable to the Durham Drive property (damaged or undamaged). The rent Barnes charged Dixon ($200 per month, or $2,400 on an annualized basis) is relatively low compared to the $275,000 value of the house. We are unwilling to ascribe the seemingly low rent either to the damage to the house or to prevailing market conditions. For the foregoing reasons, we conclude that Barnes failed to prove that the Durham Drive property was rented for a fair rental value at any point during 2008 or 2009.

To determine whether Barnes used the Durham Drive property as a residence during each taxable year, we first calculate the number of days she used

---

[23](...continued)
a reliable guide to the value of the Durham Drive property.

**[*97]** the property for personal purposes during each year. Because Dixon used the property every day during each of the years, and because Dixon did not pay fair rental value for any of these days, Barnes is deemed to have used the property for personal purposes on all 365 days of each year. See sec. 280A(d)(2). Next we compute the greater of (a) 14 days and (b) 10% of the number of days during each year for which the property was rented at a fair rental value. Sec. 280A(d)(1). The property was rented at a fair rental value during 0 days of each year. The greater of 14 days and 0 days is 14 days. The number of days each year Barnes used the property for personal purposes--365 days--is greater than 14 days. Therefore, Barnes used the Durham Drive property as a residence during each taxable year. Barnes cannot deduct expenses with respect to the Durham Drive property, with a potential exception in this case for property taxes. See sec. 280A(a) and (b).

Section 280A(b) provides that "[section 280A](a) shall not apply to any deduction allowable to the taxpayer without regard to its connection with his trade or business (or with his income-producing activity)." Section 164(a)(1) allows a deduction for certain taxes, including state and local property taxes, regardless of whether they were paid or incurred in connection with a trade or business or income-producing activity. See Tschetter v. Commissioner, slip op. at 21.

**[*98]** Therefore, section 280A(a) does not limit deductions for property taxes. See secs. 164(a)(1), 280A(b); DiDonato v. Commissioner, at *96. Accordingly, even though we hold that Barnes used the Durham Drive property as a residence during each year, Barnes might still be entitled to deduct the property taxes that she paid for the Durham Drive property for each tax year at issue.

For 2008, Barnes paid no property taxes (or any other expenses of the type that would not be barred by section 280A(a)) for the Durham Drive property.

For 2009, Barnes reported payment of $1,094 in property taxes for the Durham Drive property. The IRS fully disallowed deductions for the reported rental expenses ($10,151 for 2009) reported on Barnes's Schedule E for the Durham Drive property, which included the $1,094 in property taxes for the Durham Drive property. Therefore, the IRS disallowed any deduction for property taxes for the Durham Drive property.[24]

---

[24]Barnes reported $1,094 of property taxes as a deduction on Schedule E, the attachment on which she reported the income and expenses of the Durham Drive property. Barnes also reported $2,505 of real-estate taxes as a deduction on Schedule A to her 2009 return, but the return does not describe these taxes. Thus, the return does not explain which property the $2,505 in taxes relates to. The notice of deficiency allowed the entire $2,505 as a deduction. The IRS does not argue that the $932.49 Barnes paid in property taxes on the Durham Drive property in 2009 was part of the $2,505 deduction reported by Barnes on her Schedule A and disallowed by the notice of deficiency.

**[\*99]**  The trial record contains a check for $932.49 for property taxes for the

Durham Drive property that Barnes paid in 2009.  We find that Barnes paid

$932.49 for property taxes for the Durham Drive property in 2009.  Section 164(a)

allows a deduction for state and local property taxes.  Accordingly, we hold that

Barnes is entitled to deduct the $932.49 in property taxes that she paid for the

Durham Drive property in 2009.[25]

5.      Barnes is liable for section-6662(a) accuracy-related penalties for 2008 and
        2009.

In the notice of deficiency the IRS determined that Barnes was liable for

accuracy-related penalties under section 6662(a) of $4,606.40 and $6,352.60 for

2008 and 2009, respectively.  The IRS contends that Barnes's underpayment of tax

for each of these years is attributable to negligence or, alternatively, to a

substantial understatement of income tax.

Section 6662(a) imposes a 20% penalty on an underpayment of tax

attributable to any of the causes listed in subsection (b).  These causes include "(1)

[n]egligence or disregard of rules or regulations" and "(2) [a]ny substantial

understatement of income tax."  Sec. 6662(b)(1) and (2).  An understatement of

---

[25]Barnes was only a 50% owner of the Durham Drive property in 2009, but the IRS does not argue that the $932.49 deduction should be reduced by 50% accordingly.

**[\*100]** income tax generally is the excess of (i) the amount of the tax required to be shown on the return for the taxable year, over (ii) the amount of the tax imposed which is shown on the return. Sec. 6662(d)(2)(A). A substantial understatement of income tax is defined as any understatement exceeding the greater of "(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000." Sec. 6662(d)(1)(A). The penalty under section 6662(a) does not apply if the taxpayer can demonstrate that the taxpayer (1) had reasonable cause for the underpayment and (2) acted in good faith with respect to the underpayment. Sec. 6664(c)(1).

With respect to any penalty, section 7491(c) imposes the burden of production on the IRS. Higbee v. Commissioner, 116 T.C. at 446. This requires the IRS to come forward with evidence indicating that it is appropriate to impose the relevant penalty. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446. Once the IRS has met this burden, the taxpayer bears the burden of proving that the penalty is inappropriate because, for example, the taxpayer acted with reasonable cause and in good faith. Higbee v. Commissioner, 116 T.C. at 447.

Whether substantial understatements of income tax exist, and if so, in what amounts, will depend upon the recalculation of Barnes's 2008 and 2009 tax liabilities given the stipulations and concessions made by the parties and the

**[\*101]** holdings reached in this opinion. We leave these calculations to the parties under Rule 155.

Regardless of whether her underpayments were due to substantial understatements of income tax, we hold that they were due to Barnes's negligence. For the years in issue, we conclude that Barnes acted negligently by failing to keep adequate books and records and by not exercising reasonable care in determining her proper tax liabilities. See sec. 1.6662-3(b)(1), Income Tax Regs. Barnes was unable to substantiate the business expenses, charitable contributions, and nearly all of the rental losses that the IRS disallowed and disputed at trial. Barnes claimed Schedule-C deductions that were personal, such as her home internet expenses, or not supported by adequate documentation, such as her claimed car and truck expenses. The mileage spreadsheets that Barnes adduced in an attempt to substantiate her claimed car and truck expenses lacked credibility and reliability. In sum, Barnes was negligent in complying with her income tax obligations.

Barnes asserts a defense to the section-6662(a) penalties on the basis of reasonable cause and good faith. See sec. 6664(c)(1). In her post-trial briefs, Barnes alleges that

**[*102]** [i]n preparing her tax returns, the petitioner [i.e., Barnes] specifically consulted IRS publications 17, 463, 535 and 529. * * * The petitioner introduced as evidence receipts for almost every expense deducted. However, if any receipts were missing, the petitioner "provided proof that the expenses herein dispute were paid" whether with bank statements or credit card statements.

Barnes's underpayments did not result from any apparent misunderstanding of the tax laws but rather from her failure to substantiate expenses underlying claimed deductions with adequate records. Barnes failed to provide adequate records substantiating most of the disputed business expenses, charitable contributions, and rental losses. Barnes is an accountant with decades of experience preparing federal income-tax returns. She knew, or should have known, that she was required to maintain adequate records to support the various tax positions that she reported. Because of her failure to do so we hold that Barnes has not shown that her underpayment of tax for 2008 or 2009 was due to reasonable cause and good faith.

For the foregoing reasons, we conclude that Barnes has not established a defense to, and is liable for, the section 6662(a) accuracy-related penalties for 2008 and 2009.

**[*103]**     In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.